(No. 41635.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.*
EUGENE HAIRSTON, Appellant.

*Opinion filed September 29, 1970.*

350

MARSHALL PATNER and GEORGE J. COTSIRILOS, both of Chicago, (PATNER AND KARAGANIS, of counsel,) for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield and EDWARD V. HANRAHAN, State's Attorney, of Chicago, (JAMES B. ZAGEL, Assistant Attorney General, ELMER C. KISSANE and ANTHONY M. MONTEMURRO, Assistant State's Attorneys, of counsel,) for the People.

MR. JUSTICE CULBERTSON delivered the opinion of the court:

By separate indictments returned to the circuit court of Cook County, defendant, Eugene Hairston, was charged under a statutory theory of accountability with the murder of Leo McClure and with the attempted murders of Theodore Newsome and Dorocher Berrien. In still other separate indictments, he was charged with having solicited Dennis Jackson to commit each of the principal crimes. Upon being tried by a jury defendant was found not guilty of the charges of murder and attempted murder, but was found guilty of the charges of solicitation and was sentenced to the penitentiary for a term of 5 to 15 years on each charge, the sentences to run concurrently. He has appealed, advancing numerous grounds for reversal, several of which present constitutional questions that serve to give us jurisdiction to entertain the appeal.

It is undisputed that 13-year-old Dennis Jackson, at about 3:15 P.M. on September 12, 1967, fired six shots

from a revolver into a parked automobile in which McClure, Newsome and Berrien were sitting, wounding the latter two and killing the former. Just prior to the firing of the shots Jackson was heard to say to the men in the car: "I heard you was messing with the chief." Present in the immediate vicinity of the auto were Robert Dancy, Marvin Martin and Sanders Martin, boys ranging from 13 to 15 years of age, and Paul Martin, a young adult who was jointly indicted with defendant on all charges but tried separately. All of the persons last named, and Jackson as well, were affiliated with an organization known as the Blackstone Rangers. According to the testimony of Marvin Sanders, defendant, in his early twenties, was the self-styled "Chief" of the organization, while Paul Martin was the leader of a group within the organization which "kept order." Generally speaking, it was the thrust of the prosecution's theory and proof that Jackson had done the shooting as the result of an "order" emanating from defendant in his capacity of "chief." By the version of one witness, defendant is purported to have said that the order had issued because the men in the car were trafficking in narcotics and taking money out of the neighborhood.

Defendant was arrested on September 21, 1967, and was held in custody continuously until tried on May 15, 1968. A motion for his discharge was filed February 18, 1968, based upon the statute which implements the constitutional guarantee of a speedy trial by providing that one in custody for an offense shall be tried "within 120 days from the date he was taken into custody unless delay is occasioned by the defendant." (Ill. Rev. Stat. 1967, ch. 38, par. 103— 5.) The motion was denied, however, on the ground that a delay and continuance of trial had been occasioned by .defendant on January 19, 1968, (the 119th day after he had been taken into custody,) which caused the statutory period to run anew from January 29, 1968. More specifically, the record shows that defendant's counsel was engaged in an-

other trial on January 19, that defendant declined a proposition that an associate of his counsel be permitted to start the trial, although the associate had participated extensively and capably in involved pretrial proceedings, and that this combination of circumstances necessitated a continuance of 10 days. Defendant now contends that such delay was improperly and arbitrarily charged to him, inasmuch as he was put in the dilemma of having to choose between his right to a speedy trial and the right to be represented by counsel of his choice, and that under a proper construction of the implementing statute, the running of the 120-day period should merely have been held in abeyance from January 19 until such time as his chief counsel could appear for trial, rather than caused to run anew from the continued date.

We find no merit in either contention. As to the latter, the implementing statute and its predecessors have been repeatedly and consistently construed to mean that a delay occasioned by an accused is a waiver of the right to be tried within the statutory period, and that the period starts to run anew from the date to which the cause has been continued because of such delay. (*People* v. *Kuczynski,* 33 Ill.2d 412; *People* v. *Rankins,* 18 Ill.2d 260; *People* v. *Hartman,* 408 Ill. 133; *People* v. *Stillman,* 391 Ill. 227; *Dougherty* v. *People,* 124 Ill. 557.) It is axiomatic that where a statute has been judicially construed and the construction has not evoked an amendment, it will be presumed that the legislature has acquiesced in the court's exposition of the legislative intent. *Republic Steel Corp.* v. *Industrial Com.,* 26 Ill.2d 32; *Bell* v. *South Cook County Mosquito Abatement Dist.,* 3 Ill.2d 353; *Consumers Co.* v. *Industrial Com.,* 364 Ill. 145.

As to the first contention, a complete and careful reading of the transcript of the pretrial proceedings and activities involved, leaves us with an abiding conviction that any "dilemma" was largely of defendant's own creation; that there were several delays prior to January 19 which

were occasioned by defendant; that the prosecution was ready for trial as early as November 21, 1967; and that it was an election by defendant's counsel to have a hearing on a petition for bail (filed November 21, 1967) take precedence over trial, which was the greatest source of delay. But we need not elaborate upon the foregoing matters to arrive at a conclusion that the trial court acted neither arbitrarily nor improperly in charging the delay of January 19 to defendant. It is sufficient to say that where, as here, a continuance or delay in trial is occasioned because the counsel of an accused is engaged elsewhere, it is a delay properly charged to the acused. (*Cf. People* v. *Mueller,* 2 Ill.2d 311; *People* v. *Faulisi,* 34 Ill.2d 187.) To hold to the contrary, in our opinion, would be incompatible with the letter and spirit of the implementing statute and would serve only to provide a weapon with which the administration of criminal justice could be avoided or unduly harassed. It is true, as defendant argues, that one charged with a crime has a constitutional right both to a speedy trial and to be represented by the counsel of his choice, where he has in fact retained counsel; however, the mere fact that a defendant is not tried within the 120-day period fixed by the implementing statute, due to the unavailability of his retained counsel, does not bring the two constitutional rights in conflict or put an accused in the position of having to elect between rights. While the 120-day statute implements the constitutional right to a speedy trial, it is not coextensive with, or the precise equivalent of, the right. (*People* v. *Love,* 39 Ill.2d 436, 443; *People* v. *Stuckey,* 34 Ill.2d 521, 523.) Furthermore, both constitutional rights were designed for the protection of the accused, and it could not have been intended that one could be played against the other in order to provide an avenue to escape prosecution, which is the result for which defendant contends in this case.

A trial started on May 8, 1968, ended in a mistrial due to unfavorable publicity which had come to the attention of

the jurors, and as a consequence there was a delay until May 15, 1968. It is next contended by defendant, over and above his claim based upon the statute, that he was deprived of his constitutional right to a speedy trial and is thus entitled to discharge. He complains in particular of two continuances granted to the prosecution subsequent to January 29, 1968, which, he states, were given without cause or explanation. While we entertain some doubt that this issue was properly raised in the trial court and preserved for review, (see *People* v. *Bonds,* 32 Ill.2d 94,) we have examined the record and find it to be without merit. The right to a speedy trial guaranteed to an accused by the constitution is protection only against delay that is arbitrary, unreasonable and oppressive, (*People* v. *Hamby,* 27 Ill.2d 493; *People* v. *Stillman,* 391 Ill. 227,) and, as we recently observed in *People* v. *Love,* 39 Ill.2d 436, 442: "An important circumstance is whether there is a likelihood, or at least a reasonable possibility, that the accused has been prejudiced by the delay." No claim is made by defendant that he was prejudiced by the delays in question, nor do we perceive a reasonable possibility that such was the case. And any fair appraisal of the record does not permit a conclusion that the delay between January 29 and May 8, 1968, was arbitrary, unreasonable or oppressive. While the prosecution was granted two continuances, both of which were for just cause and fully explained, it appears that a good portion of the delay was occasioned by the unavailability of a judge or courtroom in which to hear the case due to overcrowded dockets.

By the indictments returned against defendant, the State sought to convict him of Jackson's acts of murder and attempted murder on an accountability theory under section 5—2 of the Criminal Code of 1961, which provides in pertinent part: "A person is legally accountable for the conduct of another when: * * * (c) Either before or during the commission of an offense, and with the intent to promote or

facilitate such commission, he *solicits*, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1967, ch. 38, par. 5—2; emphasis defendant's.) In addition, arising out of the same act of defendant, the State sought to convict him of crimes of solicitation under section 8—1 of the Code which states: "A person commits solicitation when, with intent that an offense be committed, he commands, encourages or requests another to commit that offense." (Ill. Rev. Stat. 1967, ch. 38, par. 8—1.) The jury, as we have said, acquitted defendant of the principal offenses, but found him guilty of having solicited Jackson to commit those offenses. Based upon the statutory language above quoted, defendant urges that the crime of solicitation merges with the principal offense if the latter offense is in fact committed, and on this basis contends that his acquittal under the charges of murder and attempted murder operates as a bar to his conviction under the charges of solicitation.

The entire Criminal Code and each of its sections must be considered in determining the legislative intent, (*People v. Touhy*, 31 Ill.2d 236,) and, when this is done, we must reject the construction for which defendant contends. Solicitation is an inchoate offense, and it is provided in section 8—5 that: "No person shall be convicted of both the inchoate and the principal offense." (Ill. Rev. Stat. 1967, ch. 38, par. 8—5.) And in the "Comments" of the committee which drafted the Code, a source we may properly consider in seeking the legislative intent, (*People v. Touhy*, 31 Ill.2d 236,) it is said in respect to section 8—5: "By virtue of the definition of 'conviction', this means that prosecution may be had for both offenses in the same trial (by separate counts) or separately. But after proceeding finally to a verdict of guilty on one or both, the judgment of conviction and sentence shall be entered on only one offense. In effect, this will apply only to solicitation and conspiracy since they are not included offenses of the principal offense which is

their object." (Smith-Hurd, Ill. Anno. Stat., ch. 38, par. 8—5, p. 391.) Again, it was stated by the drafting committee in regard to the crime of solicitation as defined in section 8—1: "Specific intent that the principal offense be committed is required, and the offense of solicitation is complete when the principal offense is commanded, encouraged or requested with that intent." (Smith-Hurd, Ill. Anno. Stat., ch. 38, par. 8—1, p. 307.) By way of contrast, the principal crimes here, murder and attempted murder, were not complete, and defendant could not be legally accountable therefore, until such time as the murder and attempted murders were committed. Having specifically spelled out that solicitation is a separate and distinct crime, punishable and triable as such, the legislature could not have intended that a merger with the principal crimes would be effected as defendant contends.

Bottomed upon a premise that the proof necessary to convict him of the principal crimes was identical with the proof necessary to convict him of solicitation, defendant next contends that the verdicts were inconsistent and that he has been placed in double jeopardy. While we believe the single prosecution here forecloses any claim of exposure to double jeopardy and that the problem is instead largely one of inconsistent verdicts, even if it were considered otherwise it is manifest that the claim of doube jeopardy has no merit. And this is so whether the situation of defendant be tested by the decisions of this court construing our own constitutional guarantee against double jeopardy, (Const. of Ill. 1870, art. II, sec. 10,) or by the judicial construction placed upon the almost identical provision of the fifth amendment to the Federal constitution, the provisions of which have lately been held to be applicable to State criminal proceedings. See *Benton* v. *Maryland* (1970), 395 U.S. 784, 23 L. Ed. 2d 707, 89 S. Ct. 2056; *North Carolina* v. *Pearce* (1970), 395 U.S. 711, 23 L. Ed. 2d 656, 89 S. Ct. 2072.

"For a double jeopardy claim to be viable, it must be shown that the two offenses charged are in law and in fact the same offense." (*Hattaway* v. *United States* (5th cir. 1968), 399 F.2d 431, 432.) "It is the identity of the offense, and not of the act, which is referred to in the constitutional guaranty against double jeopardy; * * *." (*People* v. *Ciucci*, 8 Ill.2d 619, 629, aff'd 356 U.S. 571, 2 L. Ed. 2d 983, 78 S. Ct. 839.) Two or more distinct offenses may emanate from the same transaction or act, and we have consistently held that the rule that a person cannot be put twice in jeopardy for the same offense has no application where two separate and distinct crimes are committed by one and the same act. (*People* v. *Allen*, 368 Ill. 368, 379; *People* v. *Golson*, 32 Ill.2d 398, 410-411.) Demonstrating that the same standard applies under the fifth amendment is *Gavieres* v. *United States* (1911), 220 U.S. 338, 342, 55 L. Ed. 489, 490, 31 S. Ct. 421, wherein it was said: "A conviction or acquittal upon one indictment is no bar to a subsequent conviction and sentence upon another, unless the evidence required to support a conviction upon one of them would have been sufficient to warrant a conviction upon the other. The test is not whether the defendant has already been tried for the same act, but whether he has been put in jeopardy for the same offense. A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other." Along the same lines, it has been frequently manifested that offenses are not the same if, upon the trial of one, proof of an additional fact is required which is not necessary to be proved in the trial of the other, although the same acts may be necessary to be proved in the trial of each. *Ebeling* v. *Morgan* (1915), 237 U.S. 625, 59 L. Ed. 1151, 35 S. Ct. 710; *Blockburger* v. *United States* (1932), 284 U.S. 299, 76 L. Ed. 306, 52 S. Ct. 180; *Gore* v. *United*

*States* (1958), 357 U.S. 386, 2 L. Ed. 2d 1405, 78 S. Ct. 1280; *Hattaway* v. *United States* (5th cir. 1968), 399 F.2d 431; *People* v. *Garman,* 411 Ill. 279.

When these tests and principles are applied here, it is obvious that defendant's claim of double jeopardy is unfounded. The crimes charged, *viz.* solicitation on the one hand and murder and attempted murder on the other hand, were separate and distinct crimes predicated upon different statutes, even though both arose out of the same act of defendant. But whereas proof that defendant had commanded or requested the principal crimes with the requisite intent was all that was necessary to establish his guilt of the crimes of solicitation; to establish his guilt of the principal crimes it was necessary to prove the additional fact that the principal crimes had in fact been committed. While the use of the word "solicit" in the accountability statute would appear to be grammatically out of harmony with its purport, we are constrained to remark that section 5—2 (accountability) and section 8—1 (solicitation) relate to different conduct and as a consequence entail different elements of proof. Section 5—2, in its full context, contemplates an accessorial act which "promotes" or "facilitates" another person in "the planning or commission" of an offense; section 8—1, on the other hand, encompasses only conduct whereby an accused "commands, encourages or requests another" to commit an offense. Accordingly, and for the reasons stated, we conclude that double jeopardy concepts may not be employed to relieve defendant of the consequences arising from his conviction of the solicitation offenses. *Cf. People* v. *Garman,* 411 Ill. 279.

During the pendency of this appeal the United States Supreme Court handed down a decision in *Ashe* v. *Swenson,* (1970), 397 U.S. 436, 25 L. Ed. 2d 469, 90 S. Ct. 1189, the rationale of which is that "collateral estoppel" is embodied in the fifth amendment guarantee against double jeopardy. "Collateral estoppel," as defined in the

opinion, "\* \* \* means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." (90 S. Ct. 1194.) On leave granted, defendant has filed a supplemental brief urging that the finding of not guilty as to the principal offenses should be held to estop the guilty verdicts returned in respect to the charges of solicitation. But we believe the very statement of the doctrine, or principle, of collateral estoppel is demonstrative of its inapplicability in this case. Defendant was tried for the separate crimes arising from his act in a single proceeding, and thus there was not, and could not be, a relitigation of an ultimate issue of fact previously determined by a valid and final judgment. We see in *Ashe,* based as it is on the concept that the guarantee against double jeopardy "protects a man who has been acquitted from 'having to run the gantlet' a second time," (90 S. Ct. 1195,) no manifestation or command that collateral *estoppel* is to be applied where separate offenses arising from the same act or transaction are tried in a single prosecution.

Under the evidence in the record, which in our opinion reflects proof sufficient for defendant to have been found guilty of both the principal and the inchoate offenses, we believe there is substance to the contention that the verdicts were inconsistent. But even if the verdicts be deemed inconsistent, defendant is not entitled to discharge as he contends.

An examination of pertinent decisions, many of which are collected and commented upon in an annotation found in 16 A.L.R. 3rd 866, discloses that the authorities are not fully in accord as to what constitutes an inconsistent verdict and are in sharp conflict as to the effect of inconsistency when it is found to exist. Some jurisdictions hold that verdicts respecting two or more indictments need not demonstrate rational consistency, and thus hold that inconsistent verdicts need not be disturbed. (See *Commonwealth* v.

*Parrotto,* 189 Pa. Super. 415, 150 A. 2d 396; *People ex rel. Fishback* v. *Smyth,* 87 N.Y.S. 2d 627; and *State* v. *Amerson,* 244 S.C. 374, 137 S.E.2d 284.) Particularly has this been true in the Federal courts since the decision in *Dunn* v. *United States* (1931), 284 U.S. 390, 76 L. Ed. 356, 52 S. Ct. 189. (See also, *United States* v. *Margoles* (7th cir.), 294 F.2d 371; *Murphy* v. *United States* (6th cir.), 133 F.2d 622.) Others hold that an inconsistent verdict cannot be allowed to stand, (*e.g., People* v. *Chambers,* 22 Cal. App. 2d 687, 72 P.2d 746; *Smith* v. *State,* 38 Ga. App. 366, 143 S.E. 925,) while still others hold that inconsistent verdicts on two or more indictments tried together will not be held reversibly inconsistent if, upon a consideration of the facts and circumstances of the case, they can be explained on a rational basis. (*Commonwealth* v. *Bloomberg,* 302 Mass. 349, 19 N.E.2d 62; *Holmes* v. *State,* 146 Md. 420, 126 A. 116; *State* v. *Baird,* 200 Wash. 227, 93 P.2d 409.) However, even in the jurisdictions entertaining the latter views, it is the decided weight of authority that an accused is at most entitled to a new trial on all counts, rather than to be acquitted of and discharged from the count or indictment upon which he was convicted. In support of this result it was aptly stated by a Missouri court in *State* v. *Akers,* 213 S.W. 424: "If the verdict * * * was too inconsistent to support a judgment of conviction, it was likewise too inconsistent to support a judgment of acquittal. As has often been said, 'It is a poor rule which does not work both ways.' "

Within our own jurisdiction we have, in those instances where inconsistent verdicts of guilty were returned on separate indictments or separate counts of a single indictment, aligned ourselves with those who hold that a reversal and new trial must follow. (*E.g., Tobin* v. *People,* 104 Ill. 565—larceny and receiving stolen property; *People* v. *Turner,* 256 Ill. App. 493—burglary and receiving stolen property.) But where, as here, the verdicts inconsistently

acquit and convict of separate crimes arising from the same act, our courts have followed the view that logical consistency in verdicts in such instances is not necessary, so long as the verdicts are not legally inconsistent. (*People* v. *Raddatz,* 403 Ill. 48; *People* v. *Taylor,* 56 Ill. App. 2d 170; *People* v. *Ingersoll,* 58 Ill. App. 2d 216; and see *People* v. *Garman,* 411 Ill. 279.) To use the words of the court in *State* v. *Baird* (Wash.), 93 P. 2d 409, 412, we follow the view that: "In law there is no inconsistency in verdicts of acquittal and conviction upon charges of crimes composed of different elements, but arising out of the same state of facts." The verdicts here were legally consistent, if not logically so, and defendant's claim of a right to discharge must be denied.

Contention is next made by defendant that he was not proved guilty beyond a reasonable doubt. In this regard the evidence of the prosecution established that the car in which the victims were present had been parked for some 30 to 40 minutes on 63rd Street, between Kenwood and Dorchester, before proceeding a short distance to a parking place near 6120 Kenwood where the shootings took place. Sanders Martin, age 14 at the time of trial, testified that he had encountered defendant near the 63rd Street location of the car at about 3 :00 P.M. on the day of the crime, at which time defendant indicated the parked car and told him to "burn it and hit the driver." In this, the witness was partially corroborated by Theodore Newsome, one of the occupants of the car, who testified that when the car was parked on 63rd Street he saw defendant, who was in the company of a boy on a bicycle, pointing at the car. Berrien, on the other hand, who reluctantly testified as a court's witness, stated that he had not seen either defendant or the boy on the bicycle at 63rd Street, and that he had not seen defendant at any time on that day. Sanders further testified that he understood the words "hit" and "burn" meant to kill, and that the phrase "burn a car" meant "to burn up a car."

According to the youth's further testimony he then went to his home, an apartment building but a short distance away, where he sought out Dennis Jackson, who had been living with the Martin family. He testified that he told Dennis what the defendant had said, and that the two of them, joined by Robert Dancy who also lived in the building, started to return to the area of the car. Jackson was armed with a .45 calibre pistol, and Dancy with a .22 calibre revolver. Marvin Martin, a 14-year-old brother of Sanders, followed the group and caught up to them just as they encountered Paul Martin (no relation to Sanders or Marvin) standing across the street from the place where the car was parked on Kenwood. Marvin, Sanders and Robert Dancy all testified that Paul Martin said: "There is the car. Hit it." Newsome testified that he saw the boys talking with Paul Martin, and that he commented to those in the car that: "There is that kid on the bike that I saw pointing at the car on 63rd Street." Sanders testified that the car indicated by Paul Martin was the same one he had seen on 63rd Street. It was conceded by all prosecution witnesses that defendant was not in this vicinity at, or immediately prior to, the shooting.

Evidence which we deem unnecessary to detail disclosed that after the conversation with Paul Martin, Dennis Jackson and Robert Dancy exchanged weapons, following which Jackson walked up to the car and shot its occupants under the circumstances heretofore related. It is agreed that all four boys, Dennis, Marvin, Sanders and Robert, fled to the Martin apartment immediately after the shooting. Marvin testified that defendant, accompanied by Lee Jackson (a brother of Dennis) and another man, came to the apartment about 15 minutes later bringing food and soft drinks. He said that defendant asked: "Did we handle it," and that Dennis had replied: "Yea, I shot each of them twice," whereupon defendant put the food on the table and told the boys to "dig in." Sanders further testified that Dennis asked

defendant for some money and that, pursuant to the request, defendant gave Dennis $6 and told him to give each of the boys a dollar. Marvin said that he got a dollar but gave it to Sanders. Continuing with the testimony of Marvin, Dennis asked why the shooting had been done and was told by defendant that the men in the car were dope peddlers who were taking money out of the neighborhood.

The testimony of Sanders Martin concerning the events at the apartment substantially corroborated that of his brother in every detail. Dancy, however, who admitted that there was some conversation between defendant and Dennis, said he could not recall what was said; and while he conceded that defendant had brought food to the apartment, denied that any of it had been eaten or that defendant had told anybody to "dig in." In addition, he stated that he had received a dollar from Dennis. Annabelle Martin, mother of Sanders and Marvin, testified that she was sitting in front of her home at about 3:30 P.M. on the day of the crimes, at which time she saw defendant, Lee Jackson, and a stranger enter the building. She stated that defendant was frequently at the Martin home, and often spoke to Dennis Jackson. In the same vein, and with the apparent purpose of showing that a familiarity existed between defendant and the young boys involved, Dancy had testified that he and Dennis had met and talked with defendant on the corner of 61st and Kenwood at about 2:00 o'clock of the same afternoon, or about two hours after the witness and Jackson had obtained their weapons from another member of the Blackstone Rangers.

Testifying in his own behalf, defendant stated that he was the assistant director of a Federally funded "job opportunity" program, and that he had spent the entire afternoon of the day in question, up to about 4:30 P.M., at the First Presbyterian Church, where he was assisting in the setting up of a training school. He categorically denied that he was a member of the Blackstone Rangers; that he had

been in the vicinity of 63rd and Dorchester on that afternoon; that he had pointed out a car at that location; that he had been with Dancy that afternoon; that he had been at Kenwood and 61st around 2:00 P.M., or had had a conversation with Dennis Jackson; or that he had ever solicited any person to shoot the men in the car. He testified that he, Lee Jackson and a man named Hall had left the church about 4:30, and had driven to a store at 62nd and Dorchester to get something to eat. Following this, by defendant's version, Lee Jackson went to a store and bought some food and soft drinks with $10 loaned to him by defendant and the three men then went to the Martin home, where they arrived shortly before 5:00 P.M., to permit Jackson to importune Dennis to visit their ailing mother. He said that Sanders, Marvin, Robert and Dennis were in the apartment playing records when they arrived and denied *in toto* the conversations testified to by Marvin and Sanders.

When asked if there was any discussion about money, defendant testified that Dennis had asked Lee for money, and that he, defendant, permitted Lee to give Dennis the change left over from the purchase of groceries. He said he did so because "we," apparently referring to the agency for which he worked, owed Dennis some money for his services as an usher at an "Opportunity Show" that had been staged by the Blackstone Rangers in June or July, 1967. Elaborating on this, defendant said "the group" owed Dennis "a couple of back checks," and that he thought each check "was $25 or something."

The only other witness to testify for the defense was Nancy Washburn, an assistant teacher in a "Headstart" program also located at the church. In substance, it was the thrust of her testimony that Annabelle Martin had, on two different occasions, made statements to the effect that defendant had not told Dennis to shoot anyone, but that Paul Martin had done so.

It is the province of the jury to determine the guilt or

innocence of an accused and its verdict will not be set aside on review, unless it is palpably contrary to the weight of the evidence or so unsatisfactory as to justify a reasonable doubt of guilt. (*People* v. *Nicholls,* 42 Ill.2d 91; *People* v. *Peto,* 38 Ill.2d 45.) If the testimony of the witnesses is positive and credible it is sufficient to convict, and this is so even though such testimony is contradicted by the accused. (*People v. Norman,* 28 Ill.2d 77; *People* v. *Guido,* 25 Ill.2d 204.) Here there is direct and positive evidence that defendant ordered the attack on the men in the car, that he rewarded the boys involved in the shooting, and that he explained to them the reason for his order. In addition, the jury could properly consider the evidence that defendant was the "chief" of an organization to which all of the participants belonged. Taken together, and if believed by the jury, this evidence was sufficient to convict.

To sustain his contention of reasonable doubt, defendant asserts in the main that inconsistencies and contradictions in the testimony of Sanders Martin, Marvin Martin and Newsome, when laid beside disputing testimony of other witnesses, renders the testimony of the former so unsatisfactory as to be insufficient to sustain the convictions. We have, however, carefully read this record and find no material contradictions or inconsistencies in the salient points at issue, and we are constrained to remark that certain of the representations made in the defendant's arguments here take unwarranted liberties with the record. In any event, it is the function of the jury to weigh testimony, judge the credibility of the witnesses and determine factual matters in debatable sets of circumstances, (*People* v. *Woods,* 26 Ill.2d 582,) and we find no reason to intrude upon the jury's resolution of such matters in this case.

It is next contended by defendant that there was a fatal variance between the proof and the charges in the solicitation indictments which entitles him to discharge. While we do not believe the point is well taken, it is sufficent to state

that it was not raised in defendant's written motion for a new trial and is therefore not properly before us. Where the grounds for a new trial are stated in writing, the accused is limited on review to the errors alleged therein and all other errors are deemed to have been waived. *People* v. *Irwin,* 32 Ill.2d 441, 443-444; *People* v. *Kamsler,* 40 Ill.2d 532; *People* v. *Nelson,* 41 Ill.2d 364.

As the first of several purported trial errors advanced as grounds for reversal, defendant urges that the court erred in denying a motion for a mistrial and an alternative motion that the jurors be individually and privately polled. Factual background discloses that on Wednesday, May 22, 1968, the eighth day of trial, a television crew made an uninvited and unauthorized entry into the courtroom and, employing floodlights, started to take pictures with television cameras. At the time, Sanders Martin was on the stand and there was a momentary lull in open proceedings due to a side-bar conference going on between court and counsel. The court immediately recessed the jury, called the television crew to his chambers and confiscated their film and, after discussion with counsel, offered to entertain a motion for a mistrial. Both the State and defense counsel declined to so move, the latter stating: "Whatever motions are appropriate, we ask leave to make after a jury verdict is reached in this case." The court responded to such proposal by stating: "Any motions * * * are to be made now." Following this, defense counsel also refused an offer of the court to poll the jury. Thereafter, it was agreed that the court should admonish the jury and it did so by informing them that the television crew had intruded without permission, that neither the State nor the defense were in any way at fault and that the jurors were to disregard the occurrence. The trial proceeded and continued for the balance of the week.

When court convened on Monday, May 27, 1968, defendant, outside the presence of the jury, introduced two newspaper articles, one of which had been published May

22, 1968, and the other on Saturday, May 25, 1968. The latter article was captioned "Witness Balks In Gang Killing," and within its body reported the refusal of Berrien to testify when called as a prosecution witness and further made mention of a threat alleged to have been made on his life. Stating that his action was based on the latter article, plus the television incident and the cumulative effect of prior publicity, defendant moved for either a mistrial or a polling of the jury. Both requests were denied, the court commenting in respect to the latter: "[t]he jury has been admonished every time they left here not to read or listen to radio or television views, and the court feels they will abide by the instructions of the court."

Relying upon *People* v. *Ulrich,* 376 Ill. 461; *People* v. *Munday,* 280 Ill. 32; and *Estes* v. *Texas,* 381 U.S. 532, 14 L. Ed. 2d 543, 85 S. Ct. 1628, defendant contends that the television incident was so inherently prejudicial as to deny him a fair trial, that the prejudice created was not cured by an admonition and that a mistrial should have been declared. The decisions relied upon, however, have neither application nor persuasion in the instant case. In *Estes* the court permitted the entire trial and preliminary proceedings to be televised; in *Munday* the court, without objection, permitted representatives of newspapers, allegedly hostile to the defendant, to take pictures of the jury, the accused and the court, sometimes even suspending the progress of the trial to allow the pictures to be taken; while in *Ulrich* photographs were taken of the defendants and the jury over the objection of defense counsel, photographs were taken every day, and on one day the jury, at the request of the photographers, arranged themselves in a special position for a picture subsequently published in a daily newspaper. Here, by way of contrast, there was but a single, unauthorized incident sanctioned neither by the court nor the parties. While unfortunate, we cannot say that the incident had the effect of turning the trial into "entertainment" or "a festive oc-

casion," (*Munday*, 280 Ill. at 68,) or that it came within "the almost unanimous condemnation of televised court proceedings," (381 U.S. at 580,) which prompted the reversal in *Estes*. More importantly, in light of the fleeting nature of the disturbance and the quick jury admonition by the court, we cannot say that it had the effect of subjecting defendant to an unfair and disorderly trial.

We think there is merit also to the argument of the prosecution that defendant, having declined to immediately move for a mistrial or to have the jury polled and having elected to proceed with the trial instead, is in no position to complain. (*Cf. People* v. *Keagle*, 7 Ill.2d 408; *People* v. *Greer*, 30 Ill.2d 415.) However, having concluded that the incident did not create prejudice against defendant or cause his trial to be unfair, no useful purpose can be served by extending this opinion to fully discuss the point.

Nor, under the circumstances shown in the record, do we find that the court abused its discretion in denying defendant's request that the jury be polled with reference to the news article of May 25, 1968. We find that the matter of "prejudicial publicity" first arose in the case on January 16, 1968, one of the dates it was set for trial. When court convened on that date, defense counsel introduced four news stories into the record and argued to the court that they were so inflammatory and prejudicial as to have created an atmosphere in which it would be impossible for defendant to have a fair trial. He declined, however, to ask for a continuance or a change of venue, saying that he was also insisting on defendant's right to a speedy trial, *viz.,* within the statutory period of 120 days. Thus, on the surface at least, it would appear that an effort was made to use the publicity to create an impassé which would result in discharge for lack of timely prosecution. After the court rejected a suggestion that the "dilemma" could be resolved by releasing defendant on bail, trial was continued when it appeared that defendant's chief counsel had left the court-

room to engage in another trial. The so-called "prejudicial publicity" was not pursued further.

The subject came up again when, as previously noted, a trial started May 8, 1968, ended in a mistrial after a polling of the jury revealed that several of its members had either read or listened to news reports, provoked by the trial, which were derogatory to the Blackstone Rangers. Trial was then set for May 15, 1968, and, when that day arrived, still other news reports were introduced by defendant in support of a successful motion that the jurors could not be interrogated on the *voir dire* about their knowledge of the Blackstone Rangers. The prosecution, seeking to prevent a repetition of the mistrial, requested that the jury be sequestered, (see Ill. Rev. Stat. 1967, ch. 38, par. 115—4 (m),) pointing out to the court that the case was one of great local interest which was certain to provoke extensive coverage and comment by the news media, and that the possibility existed that such publicity would come to the attention of the jurors unless they were secluded. Defendant's counsel objected, viewing the move as one calculated to prejudice the jury against his client and also stating: "I think that very clear directions from the judge to the jurors not to read the newspapers, not to listen to TV, that is another avenue open to insulate a jury or do the best we can to insulate the jury from the publicity that occurs." As a consequence, the jury was not sequestered. But before and during the trial, the jury was admonished by the court not to read or listen to the news media, and not to discuss the case with any person or among themselves.

Commenting upon a similar situation and record, we stated in *People* v. *Johnson,* 35 Ill.2d 516, 520: "* * * possible conflicts that may arise in attempting to insure unbridled freedom of the press, while at the same time seeking to afford the defendant a fair trial by an impartial jury, may be largely avoided by requesting the complete seclusion of the jury throughout the course of the proceedings. No such

request was made in this case, and under the totality of the circumstances appearing here, the trial court did not abuse its discretion in refusing to poll the jury concerning the article." (See, also, *People* v. *Brinn,* 32 Ill.2d 232, *cert.* denied 382 U.S. 827; *People* v. *Hagel,* 32 Ill.2d 413.) The same conclusion must be reached in the present case. Indeed, the "totality of the circumstances" causes defendant's failure to agree to sequestration to be more pronounced. Each time trial had been imminent, publicity appeared and defense counsel, cognizant of its possible effect on a jury, played it to the hilt when it suited his purposes. The odds were great that still more publicity would attend the trial starting May 15, and that some of it might reach the jurors and tend to create prejudice. Yet, defendant's counsel objected to the greatest precaution which could have been taken to insulate the jury and deliberately elected to rely on the adherence of the jurors to the admonitions of the court. With this background, we cannot say that the court, on the eleventh day of trial, erred in refusing to poll the jury. In so concluding we are not unmindful of the injunction of the court in *Sheppard* v. *Maxwell* (1966), 384 U.S. 333, 362, 16 L. Ed. 2d 600, 620, 86 S. Ct. 1507, 1522, when it said: "Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to insure that the balance is never weighed against the accused", or of our own decision in *People* v. *Hryciuk,* 5 Ill.2d 176, manifesting a similar view. But at the same time, we do not believe that the burden of keeping the jury free from exposure to such publicity falls entirely on the court or the prosecution, and that it must be shared by the accused as well. Most assuredly, "prejudicial publicity" cannot be used by an accused as an instrument with which to manipulate the course or outcome of his trial.

Relying heavily on *United States* v. *Rosenberg* (2d cir.), 195 F.2d 583, defendant next contends that it was error for

the court to have admitted evidence of defendant's membership in the Blackstone Rangers. To prevent the conviction of one accused of a crime merely because of his membership in an organization that is unpopular, it is the thrust of *Rosenberg* that proof of membership is admissible only if there is also sufficient proof to show that membership is related to the crime charged, for example, to show common design or purpose. And while defendant argues to the contrary, there was the necessary proof of the latter character in this case, bearing in mind that defendant was being tried for both murder and solicitation. The testimony of Marvin Sanders as to the organization and leadership of the Blackstone Rangers and as to the conduct and statements of defendant both before and after the shooting, if believed by the jury, was sufficient to permit a reasonable inference that defendant and the gang members present at the actual shooting were engaged in a common design and purpose, and that the murder and attempted murders were carried out as the result of an order given by defendant in his capacity as chief. Where the circumstances show there is a common design to do an unlawful act to which all assent, whatever is done in furtherance of the design is the act of all. *People* v. *Cole,* 30 Ill.2d 375.

Within this point of argument defendant also asserts that the evidence of membership was more inflammable than probative, thus making it inadmissible, and that the court should have given a cautionary instruction to the jury limiting its consideration of the evidence of membership. Neither contention has merit. As to the first, it has been consistently held that where evidence is relevant and otherwise admissible, it is not to be excluded because it may also have a tendency to prejudice the accused. (See *People* v. *Jackson,* 22 Ill.2d 382; *People* v. *Jenko,* 410 Ill. 478; *Welch* v. *United States* (10th cir.), 371 F.2d 287.) As to the second, which erroneously assumes that evidence of member-

ship had no probative value, it is sufficient to say that the burden rested on defendant to request a cautionary instruction if one was desired, (*People* v. *Gratton,* 28 Ill.2d 450; *People* v. *Laster,* 413 Ill. 224,) and we are neither told, nor do we find, that such a request was made in this case.

It appears without dispute that Robert Dancy made a statement to investigating authorities, reduced to writing, wherein he said, *inter alia,* he had been told by Dennis Jackson that a man named Junior Lafayette had hired Jackson to do the shooting. Because of its obvious hearsay character the court refused to permit this portion of the statement to be brought to the attention of the jury, and it is now contended by defendant that it was admissible by virtue of our decision in *People* v. *Lettrich,* 413 Ill. 172. In the latter case we recognized the general rule to be that unsworn declarations of a third party that he committed a crime are inadmissible as pure hearsay, but concluded that, in fairness and justice, the particular circumstances of the case required a departure from the rule. The circumstances of the instant case are not even remotely similar.

In *Lettrich,* the accused had been convicted of murder and sentenced to death solely on the basis of a confession which was inconsistent with many of the known facts and suspect of having been extracted by physical coercion; the accused had repudiated the confession; and the third party, who had admitted the same murder to the director of a behavior clinic, was outside the jurisdiction of the court. Observing that "justice requires that the jury consider every circumstance which reflects upon the reliability of [the] confession," (413 Ill. at 179,) we held that the director of the clinic should have been permitted to give his hearsay testimony as a departure from the general rule. In the instant case the evidence tending to convict does not center on a dubious, repudiated confession and the person with whom the hearsay originated, Jackson, was not shown to be

outside the jurisdiction of the court. Accordingly, neither justice nor fairness required a departure from the rule.

Defendant next suggests by citation of authority, (*viz. People* v. *Daniels,* 92 Ill. App. 2d 207,) but does not otherwise present argument, that hearsay admissions of co-conspirators are admissible as an exception to the hearsay rule. Due to the manner of its presentation, we would be justified in treating the contention as waived and abandoned. (*People* v. *Smith,* 404 Ill. 125, 133; *People* v. *Kelley,* 8 Ill.2d 604, 617; *People* v. *Barnes,* 26 Ill.2d 563, 567.) But it is, in any event, without merit in this case. The statement of Dancy being relied upon was given to the authorities at the time of arrest and, as defendant's own authority recognizes, does "not fall within the exception to the hearsay rule which allows statements in furtherance of a conspiracy into evidence." 92 Ill. App. 2d at 214; see *People* v. *Tunstall,* 17 Ill.2d 160.

As the next error relied upon for reversal, defendant contends that it was error for the court to bar the testimony of a clergyman who had been present in the courtroom in violation of an order excluding witnesses. It is well settled, however, that the matter of permitting such a witness to testify rests within the sound discretion of the trial judge, (*People* v. *Raby,* 40 Ill.2d 392; *People* v. *Scott,* 38 Ill.2d 302,) and that a judgment will not be reversed for refusing to allow a witness to testify unless it is made to appear that the party offering such witness has been deprived of materal testimony without his fault. (*People* v. *Russell,* 17 Ill.2d 328; *People* v. *Crump,* 5 Ill.2d 251.) On the record here, we find no breach of discretion. The offer of proof showed that the witness would testify only that the reputation of the State's witness, Annabelle Martin, for truth and veracity was bad and that he would not believe her under oath. Apart from the circumstance that this testimony did not relate to a material matter, it was, to a certain extent, merely cumulative to the testimony of Nancy Wash-

burn, the whole body and purpose of which was to establish that Mrs. Martin was an unreliable witness. Furthermore, the only important and material facet of Mrs. Martin's own testimony was that defendant had come to the apartment at about 3:30 P.M. on the afternoon of the shooting and it is not to be overlooked that she was corroborated as to the time by her sons, Sanders and Marvin, and by Robert Dancy.

Finally, it is contended that the prosecutor was guilty of improper and prejudicial closing argument when he represented defendant as controlling the neighborhood; commented that defendant had not recognized or given any rights to the shooting victims; referred to the organization of the Blackstone Rangers and defendant's position as its chief; and commented unfavorably on the accused and urged his conviction. It has been said many times, however, that arguments and statements based on the proof or legitimate inferences deductible therefrom do not transcend the bounds of legitimate argument, (*People* v. *Ostrand,* 35 Ill.2d 520; *People* v. *Miller,* 13 Ill.2d 84,) and that it is entirely proper for the prosecutor to dwell upon the evils of crime and to urge the fearless administration of the law. (*People* v. *Williams,* 26 Ill.2d 190; *People* v. *Burnett,* 27 Ill.2d 510.) We have read the arguments in their entirety, with particular attention to the isolated excerpts of which complaint is made, and conclude that the bounds of proper argument were not exceeded.

The judgments of the circuit court of Cook County are affirmed.

*Judgments affirmed.*