The People of the State of Illinois, Plaintiff-Appellee, *v.* Freeman Johnson, Defendant-Appellant.

(No. 59430;

First District (5th Division)—May 9, 1975.

James J. Doherty, Public Defender, of Chicago (John Thomas Moran and Marc Fogelberg, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., Mary Ellen Dienes, and Forrest M. Tatel, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial defendant was found guilty of burglary, armed robbery, and rape in violation of section 19—1, 18—2 and 11—1(a) of the Criminal Code. (Ill. Rev. Stat. 1971, ch. 38, pars. 19—1, 18—2 and 11—1(a).) He was sentenced to concurrent terms of 25 to 75 years on the rape and armed robbery and 5 to 15 years on the burglary plus 5 years' parole on all sentences. On appeal he contends: (1) the trial court erred in denying his motion to suppress certain physical evidence; (2) the court erred in admitting certain hearsay evidence; (3) his due process rights were violated by the State's assertion that stains on his clothes were paint from the window of the complaining witness' apart-

ment; (4) the suggestive line-up procedure violated his due process rights; (5) he was not proven guilty beyond a reasonable doubt; (6) he could not be found guilty of all three charges since they arose out of the same facts; and (7) the sentences imposed were excessive.

The following evidence was adduced on defendant's pretrial motions to suppress certain physical evidence and to suppress the line-up identification.

For the defense:

*Peter Tortorice*

He is a Chicago police officer. At 2:45 A.M. on August 2, 1972, he and his partner, Officer Daniel Zelago, proceeded to 4929 W. Washington in Chicago to investigate the report of a rape and robbery. They met Bernice Davis and John Patterson at the scene.

Patterson told them that as he was sleeping in the back bedroom of Davis' first-floor apartment, a male Negro about 18 years old, 5'7" tall, weighing 140 to 150 pounds and wearing a dark shirt and light-colored pants had climbed through the window. The intruder told him: "Don't make any sound, I got a partner who is in another room" and then left the bedroom. The window had been freshly painted and smudge marks could be seen in the paint.

Bernice Davis told them that after she awoke, her assailant hit her. He was 18 years old, weighed about 140 pounds, and was wearing dark upper clothing and light-colored pants. He put a sharp object at her neck and said: "Don't make a sound, somebody else is in the other room with the gentleman, and somebody will end up getting hurt." He then forced her to have sexual intercourse with him. Before leaving the apartment, he took two purses.

Tortorice and Zelago then spoke to Dolores Graham, the victim's neighbor. She told them that she had seen a male Negro with a dark shirt and light-colored pants come out of Bernice Davis' front door and enter a building down the street.

They immediately went to the building at 4911 W. Washington, and inquired at the first-floor apartment and then at the second-floor apartment regarding whether anyone there fit the assailant's description. They were directed to the basement apartment.

When they knocked on the door of that apartment a man answered. They asked if any 18-year-old boys were there. Another man who identified himself as Mr. Johnson came to the door. When Johnson told them that one boy was sleeping on the couch, they asked to see him. The room was dark and they went to the couch to see the boy. As they shined their light around the room, in addition to the boy on the couch, they saw defendant sitting in a chair. He was fully clothed and had white paint

on his pants leg and on his hands and arm. Tortorice recognized defendant as the person they had stopped at about 1 A.M. that morning in the 5000 block of Washington. They had completed a "field contact card" at that time which listed 4911 Washington as defendant's address.

The officer asked defendant where he had been earlier in the evening. Johnson, who had identified himself as defendant's father, said that defendant had been home all evening. However, upon being told that the officers had stopped defendant earlier that evening, Johnson admitted that defendant could have left while he was asleep.

Tortorice then told the father that they would have to place the defendant under arrest for suspicion of rape, and as he and his partner moved toward the defendant, defendant reached "by the cushion." His partner grabbed him and recovered a can opener from under the front part of the cushion. Tortorice asked Johnson if they could look around the apartment. Johnson said: "Sure, we got nothing to hide, go right ahead." He searched the apartment and found two purses in the bathroom. One contained Bernice Davis' identification cards.

### Police Officer Daniel Zelago

In addition to the testimony corroborated by Tortorice, Zelago testified that while they were talking to the defendant, the father came out and asked what was going on. Zelago saw the young man get up and bend down. Right next to his chair was the couch. Zelago went there and put his hand where the defendant's was and pulled out a sharp object which turned out to be a can opener. Then they arrested him.

### Bernice Davis, called for the defendant

She called the police to report a rape and robbery. Two officers responded and she described her assailant as 18 or 19 years old, about 140 pounds, wearing dark upper clothing and lighter pants. He had thick lips and didn't have a bushy head of hair. She did not recall a band-aid on his forehead.

### Freeman Johnson, defendant

Following his arrest he was taken to a police station. While handcuffed, he was placed in a small office. The police brought the complaining witness to the office and she observed him. He had not seen her at the station prior to that time. The line-up occurred 5 or 6 minutes later. He has used the name Dale Miller as an alias.

### Bernice Davis, for the State

She did not see the defendant at the station prior to the line-up nor did anyone show her any pictures of the defendant. She did not look into a small room at the station.

Defendant's motions were denied and at trial the following witnesses testified for the State.

*Bernice Davis*

On the evening of August 1, 1972, her two aunts, her daughter, and John Patterson were staying with her at her apartment at 4929 W. Washington. Patterson, who was helping her paint and decorate, was staying in the back bedroom and she was sleeping in the living room. The window in the back bedroom had been painted white a few days earlier.

At about 2 A.M. she was awakened. She jumped up and defendant, who was the only other person in the room, hit her several times. She could see him clearly by the light which was shining in through a transom. He said: "Don't holler, don't scream, don't say anything my friend is in back with a gun and he is a crazy mother fucker, he will kill somebody." He told her to remove her nightgown. He tore it when she did not respond fast enough. He then placed a sharp object to her neck and forced her to have sexual intercourse with him. Afterwards, when he demanded money, she told him that her money was in her purse. He then covered her head with a pillow, hit her, took two purses which contained $127 and her identification cards, and left by the front door.

She then called the police. When they arrived, she described her assailant. The police left, but about 10 or 15 minutes later returned with her purses. She identified the defendant in a line-up at the police station about two hours after the incident.

*John Patterson*

He substantially corroborated Bernice Davis' testimony. At 2:15 A.M. he awoke and looked at his clock. As he started to lie back down, defendant sprang from the foot of the bed, placed a sharp object against his neck and asked about the valuables in the house. Defendant told him not to make any noise because his partner, who was in the other room, had a gun and would shoot someone. The defendant then left the bedroom. Patterson heard someone talking in the other room. About 10 minutes later he saw Bernice Davis. Her nightgown was torn and her face was puffed and scratched. She said she had been raped and robbed. Later that morning he viewed a line-up at the police station and identified the defendant as the intruder.

*Dolores Graham*

She lives at 4931 W. Washington, next door to Bernice Davis. At about 2 A.M. on August 2, 1972, she heard a noise. When she looked out her window she saw a young male Negro come out of Davis' apartment and enter another building about four doors away.

*Police Officer Peter Tortorice*

He essentially repeated the testimony he had given on the motions. Additionally, he testified that he observed smudges in the fresh paint on the window of the back bedroom. He noticed no paint stains on defen-

dant when defendant was stopped prior to the incident, but he did see paint stains on defendant at the time he was arrested. After the arrest the officers returned with the purses to Bernice Davis' apartment and she identified the purses.

The parties stipulated that the swab taken from Bernice Davis' vagina on August 2, 1972, disclosed the presence of sperm. The court, over defendant's objection, admitted into evidence the can opener and a purse which had contained Davis' money and identification cards. Defendant presented no evidence, and the jury returned a verdict against him.

### Opinion

The defendant contends that the trial court erred in denying his motion to suppress physical evidence. He complains that neither the can opener nor the purse should have been admitted into evidence. (We note that only one purse was admitted into evidence.)

■■ Defendant first complains that the can opener should not have been admitted since it was not seized incident to lawful arrest, but rather was seized prior to arrest. However, if probable cause to arrest without a warrant exists, it is immaterial that a search precedes an arrest. (*United States v. Jenkins* (2nd Cir. 1974), 496 F.2d 57; *United States v. Riggs* (2nd Cir. 1973), 474 F.2d 699; *Bailey v. United States* (D.C. Cir. 1967), 389 F.2d 305.) In the instant case when the officers were looking for the assailant, they had a description given by three people and they had information that he had entered a particular building. They were told by another resident in that building that some young people lived in the basement apartment. Then when they encountered defendant in that apartment they recognized him as the person they had stopped earlier in the evening. They knew that a crime had been committed and had reasonable grounds to believe that defendant was guilty of the offenses. It is clear that this search was reasonable, as the item in the couch may have been a weapon and probable cause for arrest existed prior to the seizure of the can opener.

Defendant also complains that the trial court erred in admitting the purse. He states that no showing was made that the person who consented to the search had "common authority" over the premises and also that the consent was a result of coercion.

At trial defendant failed to produce any evidence proving that the consent was improper in any way as required by section 114—12(b) of the Code of Criminal Procedure (Ill. Rev. Stat. 1971, ch. 38, par. 114—12). The only evidence adduced at trial showed the person giving consent was defendant's father, that defendant resided at this address and

that the purses were found in the bathroom. It was reasonable for the officers to believe that the defendant's father also resided at this address (*People v. Rodriquez*, 79 Ill.App.2d 26, 223 N.E.2d 441), and defendant offered no evidence to contradict any of these points.

■■ A person who has common authority with another to use certain premises may consent to a search of those premises. (*United States v. Matlock*, 415 U.S. 164. See also *People v. Johnson*, 23 Ill.App.3d 886, 321 N.E.2d 38.) In the case at bar, the father who resided with defendant consented to a search of the bathroom which would clearly be an area over which he had common authority.

Defendant also states that the consent was not freely given, but was the result of implied coercion. Whether a consent was given freely "is a question of fact to be determined from the totality of all the circumstances." (*Schneckloth v. Bustamonte*, 412 U.S. 218, 227.) Here, although the police arrested defendant at night and in his father's presence, defendant's father, who obviously was aware of what was happening, said: "We got nothing to hide, go right ahead" when asked by the officers if they could search the apartment. The police did nothing improper. They did not intimidate or coerce Johnson and defendant was present at the time the consent was given. The mere fact that the consent here was given at night does not render the consent invalid. The motions to suppress were properly denied.

■■ Defendant next contends that the trial court erred in admitting certain hearsay evidence. He argues that Officer Tortorice's references at trial to his father's statement that defendant could have left the house while his father was sleeping violated his constitutional right of confrontation and his right not to testify against himself. The instant statement does not indicate that defendant actually left the house. It indicated only that defendant could have left while his father was sleeping. Since Officer Tortorice testified that he had seen defendant earlier in the evening, even if the father's statement did indicate that defendant had left the apartment, such evidence would only have been cumulative. In these circumstances, we cannot say that the statement required defendant to testify or that it violated his right of confrontation.

■■ Defendant next contends that his due process rights were violated by the State's assertion that stains on his clothes were paint from the window of the complaining witness' apartment. In opening statements and in closing arguments, the State argued that the stains on defendant's clothes were white paint from the windows of the complaining witness' apartment. He argues that the State should not have made such comments in the absence of scientific proof that the stains were paint and that if paint, were paint from the complaining witness' window.

The law is clear that a prosecutor in argument may draw reasonable inferences from the record. (*People v. Hairston*, 46 Ill.2d 348, 263 N.E.2d 840.) Here, Officer Tortorice testified that the stains were paint. There is nothing in the record to contradict his testimony or to establish that Tortorice is not competent to recognize paint stains. Scientific evidence was not required. Tortorice also testified that when he saw the defendant before the incident defendant did not have such stains on this clothes, but at the time of arrest he did. Moreover, Tortorice saw the smudges in the paint on the windows. In these circumstances, the prosecutor's comments were justified.

■■ Defendant next contends that the suggestive line-up procedure violated his due process rights. He argues that he was the person in the center of the line-up and the only person with paint stains on his clothing. We note that this argument was not raised by defendant in his pretrial motion. There, defendant argued that the line-up was suggestive because there was a confrontation prior to the line-up. A line-up which suggests that someone is the perpetrator of a crime is improper. (*People v. Blumenshine*, 42 Ill.2d 508, 250 N.E.2d 152.) However, even if police procedures were improper, identification testimony which has an independent basis in fact is admissible. (*People v. Martin*, 47 Ill.2d 331, 265 N.E.2d 685; *People v. Blewett*, 11 Ill.App.3d 1051, 298 N.E.2d 366.) The record here clearly shows that during the incident the complaining witness had ample opportunity to observe the defendant. The lighting was good and defendant made no attempt to cover his face. Moreover, she not only identified him within a few hours of the incident, but once again in open court. Her identification was positive and credible. Patterson also identified defendant. Even if the line-up had been conducted improperly, the identification had an independent basis in fact. The trial court properly admitted Bernice Davis' identification testimony.

■■ Defendant next contends that he was not proven guilty beyond a reasonable doubt. He argues that the identification testimony was vague, doubtful and uncertain and that one man could not have committed the crimes. The law is well established that in a jury trial the credibility of witnesses and questions of fact must be resolved by the jury. Here, the jury heard the evidence and chose to believe the State's witnesses. We cannot say that this belief was misplaced. Defendant was identified by two eyewitnesses and he was linked to the crime by the paint stains and by the proceeds of the robbery.

Defendant, relying upon *People v. Lilly*, 56 Ill.2d 493, 309 N.E.2d 1, contends that since the crimes of rape, armed robbery and burglary were a single transaction and were not independently motivated, only

one conviction can stand. Alternatively, he contends that if the crimes did not arise from the same transaction, the lesser offense of burglary must be reversed. Having examined the record, we do not believe the rape and the armed robbery arose out of the same conduct, but rather that they were two separate and unrelated offenses. *People v. Williams,* 60 Ill.2d 1; *People v. Johnson,* 44 Ill.2d 463, 256 N.E.2d 343.

■■ In *Williams* defendant was found guilty of murder, armed robbery and burglary. The court held that since defendant entered with intent to commit the robbery there were two offenses arising out of the same conduct, but that only the conviction for the most serious can stand. In the instant case since the burglary occurred as part of the rape or robbery, it was committed with intent to perform one of these crimes and arose as part of the conduct necessary for completion of one of those acts. Therefore, the judgment on the lesser offense of burglary must be reversed.

■■ Defendant finally contends that his sentences are excessive. While this court, in its discretion, may reduce sentences, this discretion is exercised with great care in view of the trial court's superior opportunity to make such judgments. Here, defendant had a prior criminal record and the instant crimes are of a serious nature. The trial court sentenced him to concurrent terms of 25 to 75 years, and these sentences are within the statutory limits. In the circumstances of this case, we cannot say that defendant's sentences are excessive.

For the foregoing reasons, the judgments finding defendant guilty of armed robbery and rape are affirmed, and the judgment finding defendant guilty of burglary is reversed.

Affirmed in part, reversed in part.

DRUCKER and SULLIVAN, JJ., concur.