THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
RUDOLPH L. LUCIEN, Defendant-Appellant.

Fifth District   No. 77-300

Opinion filed November 22, 1978.

Rudolph L. Lucien, of Chicago, for appellant, *pro se.*

Howard L. Hood, State's Attorney, of Murphysboro (Bruce D. Irish and Martin N. Ashley, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE JONES delivered the opinion of the court:

Defendant, Rudolph L. Lucien, was charged by information with the offenses of rape, unlawful restraint, aggravated assault and unlawful use of

weapons (Ill. Rev. Stat. 1975, ch. 38, pars. 11—1, 10—3, 12—2(a)(1) and 24—1(a)(4)). Following a jury trial in the circuit court of Jackson County, defendant was found guilty of aggravated assault and unlawful use of weapons and not guilty of rape and unlawful restraint. The trial court imposed sentence upon the unlawful use of weapons offense only, sentence being 364 days imprisonment and payment of a $1,000 fine and the costs of the proceedings. The trial court further ordered that this term of imprisonment be served consecutive to sentences imposed upon prior offenses arising out of Cook County.

In this appeal, defendant contends that he was denied a fair trial as a result of questioning by the prosecutor concerning his post-arrest silence and the court's granting, without proper foundation, a motion for leave to call a court's witness, that the evidence is not of the clear and convincing quality required to sustain a conviction, that the verdicts are legally inconsistent and that he was denied his right to a speedy trial.

On October 21, 1976, Maria Radosta stood at the edge of Carbondale, attempting to "hitch" a ride to Makanda. For several days, Radosta, a resident of Champaign, Illinois, had been visiting a friend in Makanda, staying in her trailer home. On October 21, Radosta shopped in various stores in Carbondale. When she was ready to return to Makanda, she called her friend's trailer to seek a ride. After calls over several hours went unanswered, she decided to hitchhike back.

According to Radosta, a black male in a dark colored car stopped for her. This man was the defendant. He was dressed well, wearing a light beige sports coat. He agreed to give her a ride to Makanda and indicated that he lived somewhere south on Route 51, past the SIU Arena. Their conversation was quite friendly. At some point defendant told Ms. Radosta that his name was Rudy.

After traveling south of town some distance, the defendant turned right onto a side road. Radosta told him it was the wrong road. When defendant persisted in driving on, she asked him to turn around. He agreed to do so but shortly thereafter turned onto another road which he claimed was the "scenic route." This road actually made a dead-end at Cedar Lake. At the road's end, defendant stopped the car and used electronic controls on the driver's door to close the car's windows.

Defendant removed a small handgun from the inside of his coat and pointed it at Radosta's head, saying, "Get in the back and take off your clothes." The gun had two barrels, one on top of the other. When Radosta pleaded with him to take her to Makanda, defendant threatened to blow her head off and leave her lying out there. Ms. Radosta then talked defendant into putting the gun away. She got into the back seat and disrobed. Defendant also got in the back seat. He pulled down his trousers and told Radosta twice to "eat him," which she refused to do. He

then got on top of her and commenced to have intercourse with her. Defendant stopped before reaching a climax because he felt she was "cold" and "frigid." He told Radosta to get dressed, that he would take her where she wanted to go.

On the ride to Makanda, defendant became friendly once again, treating the incident as a joke, saying that the gun was a toy and that he felt if Radosta had gotten excited she would have enjoyed having intercourse with him. During the drive, Radosta declined an offer to let her look at the gun and refused several requests of the defendant that she go out to dinner with him or allow him to see her again. When they reached Makanda, defendant stopped the car before several storefronts. He indicated that he wished to talk further. They then talked for about one-half hour. The conversation centered around their respective attitudes towards drugs, but defendant continued to ask her out. During the time they were talking, a proprietor of one of the stores who was a recent acquaintance of Radosta, walked past the car. Radosta, feeling things were under control, merely said hello to him. Shortly thereafter she left the car and returned to her friend's trailer. After taking a shower, Radosta began to tell her friend about the incident but did so without detail since other people visiting in the trailer were listening also.

On the following day, Radosta returned home to Champaign as she had earlier planned to do. She did not report the incident to the police because she was confused, scared and did not wish to think about the incident any further. On Sunday, October 31, Radosta returned to Carbondale in the company of two lawyers who helped persuade her to report the incident to the police, which she did on November 1, 1976.

On that day the Carbondale police arrested defendant and pursuant to a search warrant seized several items described by Ms. Radosta, including a .22-caliber derringer found under the mattress of the bed in defendant's apartment. At trial, the complainant identified a key chain, a tassel and a necklace as being items that had been in the defendant's car. She also identified a black zippered briefcase as being similar to one that had been on the floorboard of defendant's car. Radosta further testified that the gun looked like the one defendant threatened her with and that two photographs admitted at trial accurately depicted the exterior and interior of the car in which the alleged crimes took place.

Bill Jezzard, proprietor of the Rainmaker Shop in Makanda, testified for the State that on October 21 he saw Ms. Radosta in the passenger seat of a car that looked like the one shown in the photographic exhibits. The car was parked before the storefronts. Jezzard said hello and Radosta responded in kind in a "cracked" voice. She was sitting against the door with her arms folded in front of her and seemed very upset, looking as if she had been crying. He could tell that a black man was in the driver's seat but could not see him clearly because of the tinted glass of the windshield

and the glare of the sun. When Jezzard came back down from his residence above his shop in five to ten minutes, the car was gone.

The defendant testified in his own behalf and gave a markedly different account of the instant encounter. He testified that on the afternoon in question he was driving a black, 1972 Dodge Charger, heading for his residence in the Shamrock Apartments. While stopped at a traffic signal, Ms. Radosta approached his car and asked if she could have a ride if he were headed south. Defendant agreed. In order to clear a space for her to sit, he moved various items off the front seat, including a toy derringer intended for his nephew, which he had just purchased. This toy gun was admitted at trial as defendant's exhibit number 2. Ms. Radosta saw the gun and asked if it were real. Defendant did not have any real weapons in the car.

When defendant stopped at a store known as Arnold's Market, Ms. Radosta asked him if he would take her to Makanda if she gave him gas money. She further said that Makanda was only a few miles down Route 51. He agreed. While driving south, defendant noticed that Ms. Radosta was acting strangely, making sharp, erratic movements and speaking incoherently. When he inquired what was wrong, she said that she had taken some LSD. During further conversation, she related that she and her boyfriend had recently made a cross-country trip in his van, that they had taken LSD during the trip and that she had parted company with him in Carbondale three days earlier because of sexual advances he had made towards her.

The defendant testified that he made a wrong turn while on the way to Makanda but that he immediately turned around and got back on course. When he got to Makanda, he parked the car in front of a store called Makanda Java. He and Ms. Radosta then talked for an hour. During this time, there were many people around; Ms. Radosta waved at three of them. At no time did he make any sexual advances towards Ms. Radosta.

Defendant further testified that he took the toy gun, defendant's exhibit number 2, to Chicago the following weekend and left it there. The only time he had ever seen the real gun discovered at his apartment was when his "cousin" Ethel Lavine showed it to him and his mother during the previous summer.

Defendant also offered the testimony of his mother, Claudia Jackson, and his cousin by marriage, Ethel Lavine.

Ms. Jackson testified that defendant came to her home in Chicago during the weekend of October 29-31, 1976. He brought toys to her grandson Renard on that visit, including a toy gun. On November 1, defendant called her and informed her that he had been arrested and that a gun had been found in his apartment. He asked her to look for the toy

gun he had brought home for Renard. Several weeks later she located the toy gun and mailed it to the public defender representing defendant.

Ethel Lavine related that on October 31, 1976, she followed defendant in a separate automobile from Chicago to Carbondale. The purpose of her trip was to pick up two paintings from Rudy's apartment and to see the campus. Ms. Lavine stated that she stayed overnight in defendant's apartment, returning to Chicago on the following day. She and Rudy were the only persons to spend the night in the apartment on the 31st. She slept on the bed and defendant slept on the couch. When changing clothes, Ms. Lavine discovered that she had inadvertently brought a .22-caliber derringer to Carbondale in her luggage. The defendant was not in the apartment at this time. Ms. Lavine then placed the gun beneath the bed's mattress for safekeeping but forgot to remove it before returning to Chicago. Although she knew on Monday, November 1, 1976, that her gun was connected with defendant's arrest, she did not talk to defendant or defendant's attorney about her ownership of it until the day before trial, April 3, 1977.

Deborah Bracy was called in rebuttal as a court's witness. She testified that she had lived with defendant at the Shamrock Apartments for three or four months before he was arrested. She rode to Chicago with defendant on Halloween weekend. They returned on Sunday, the 31st, and spent the night in their apartment, sleeping in its one bed. She did not see Ethel Lavine that weekend. Ms. Bracy in the past had seen the real gun in the apartment and in the possession of defendant. Since the gun was not hers she had assumed that it belonged to defendant. She further testified that when she visited defendant at the jail, he asked her to testify that the gun was hers. Since this was untrue, she refused to do so. On cross-examination it was established that Ms. Bracy had become distraught and angry at defendant during his incarceration as a result of his breaking off their engagement.

Defendant then testified in surrebuttal. He denied ever having been in possession of the derringer or asking Deborah Bracy to testify that it belonged to her. In addition, he testified that in 1975, Ms. Bracy had been in possession of a gun that was similar to the derringer. He further stated that Deborah had told him that she had told an attorney by the name of Bob Farrell that the gun was hers at a time when neither she nor defendant knew to whom it belonged, being before Ethel Lavine informed defendant she had left it at the apartment. Defendant testified that Ms. Bracy took a toy gun to the public defender but later came back and retrieved it. On cross-examination, defendant testified that his mother sent two toy guns to the public defender's office. Counting Ms. Bracy's toy gun a total of three were delivered to the public defender.

Defendant's first contention is that he was denied a fair trial under the rule of *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, as a result of questioning by the prosecutor concerning defendant's post-arrest silence. We find this contention to be without merit.

In *Doyle v. Ohio*, the Supreme Court held that it is a violation of due process for a State prosecutor to seek to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving *Miranda* warnings at the time of his arrest. The court reasoned that it would be fundamentally unfair to advise a person that he has the right to remain silent and then allow that silence to be used to impeach an explanation subsequently offered at trial. 426 U.S. 610, 618, 49 L. Ed. 2d 91, 98, 96 S. Ct. 2240, 2245.

The initial information concerning whether defendant remained silent after his arrest was elicited through defense counsel's cross-examination of Carbondale police officer Daniel Vinzant. During this examination, in response to a question concerning defendant's cooperation after arrest, the officer related that defendant, after being advised of his rights, refused to sign a *Miranda* warnings form or give any statement. The officer immediately agreed that both of these actions were within the defendant's rights. Later, the prosecutor questioned defendant about a conversation that occurred upon his arrest. After the defendant indicated that he had asked the officer relating the elements of .the offense, "why," the following colloquy occurred:

> "[State's Attorney:] Are you telling us that you talked to the police after you refused to sign the Miranda warning?
>
> [Defendant:] I talked to a police officer.
>
> Q. Who?
>
> A: Detective Kilquist.
>
> Q: And he gave you the details of the offense?
>
> A: Yes sir."

■■ These portions of the record simply do not present a *Doyle* violation. First, the defendant may not properly claim error with respect to the comments made by Officer Vinzant during examination by his own counsel. The *Doyle* opinion was directed solely at attempts by the prosecutor to impeach the defendant's testimony by his post-arrest silence. Here, the prosecutor was not responsible for the testimony of Officer Vinzant. It was elicited by defendant's own counsel. Moreover, it does not appear that defendant could have been prejudiced by Vinzant's remarks since the officer readily admitted that defendant had every right to refuse to make a statement or sign a *Miranda* form. Second, we fail to see any indication in the above-quoted colloquy that the prosecutor drew any undue attention to defendant's post-arrest silence so as to imply that his defense was a recent fabrication. We have carefully examined the

closing arguments of the prosecutor and find them free of any comment as to defendant's post-arrest silence.

■■ The defendant also objects on the basis of *Doyle* to the prosecutor's questioning of Ethel Lavine whether it ever occurred to her to come to Jackson County to explain that the gun was hers, and of defendant whether he knew why Deborah Bracy did not tell the police that the derringer was hers, after making such a representation to one of defendant's attorneys. *Doyle* is directed at protecting the defendant from having his testimony impeached because of his silence in the wake of receiving *Miranda* warnings. (*People v. Henson* (1978), 58 Ill. App. 3d 42, 373 N.E.2d 852; *Doyle v. Ohio*, 426 U.S. 610, 617-19, 49 L. Ed. 2d 91, 97-98, 96 S. Ct. 2240, 2244-45.) Neither of these questions are directed at defendant's post-*Miranda* silence but rather at the inactivity of one actual and one potential defense witness. The prohibition of *Doyle* was not violated by this questioning.

As already indicated, defendant's girlfriend and roommate, Deborah Bracy, testified in rebuttal as a court's witness. The defendant contends that the trial court erred in granting the State's motion for leave to call Ms. Bracy as a court's witness because the State failed to lay a proper foundation for the calling.

■■ It has often been stated that the proper foundation which must be laid for the calling of a court's witness consists of the giving of the reasons why the party desiring the witness cannot vouch for his veracity, and a showing that the testimony of the witness will relate to direct issues and is necessary to prevent a miscarriage of justice. (*People v. Dennis* (1970), 47 Ill. 2d 120, 265 N.E.2d 385, *cert. denied* (1971), 403 U.S. 907, 29 L. Ed. 2d 683, 91 S. Ct. 2212; *People v. Moriarity* (1966), 33 Ill. 2d 606, 213 N.E.2d 516; *People v. Robinson* (1977), 46 Ill. App. 3d 713, 361 N.E.2d 138.) After reviewing the foundation presented by the State, we find that these requirements were satisfied here.

Prior to Ms. Bracy's being called as a court's witness, it had been established that Ms. Bracy lived with defendant at the time of his arrest and for several months prior thereto. Further, defendant had asserted as a defense to the charges involving the gun that it had not been in Carbondale until October 31, ten days after the incident. On that day, unbeknown to defendant, Ethel Lavine had inadvertently left the gun concealed under the mattress in defendant's apartment, at a time when Ms. Bracy was still in Chicago. The prosecutor, in effect, drew the trial court's attention to both these matters. He also informed the court that the State had been unable to serve a subpoena on Ms. Bracy until the previous day during trial, at which time she was in the company of defendant's mother and other friends. The prosecutor further informed the court that he had talked to the proposed witness in his office after proceedings had concluded on the previous day.

At that time Ms. Bracy told him she did not want to testify. When asked if she would tell the truth about the gun, she had responded that she had no comment, repeatedly stating that she did not wish to talk about it.

Through this presentation, the State sufficiently established why it could not vouch for the veracity of Bracy. She was very close to defendant, as was evidenced by the fact that she had lived with him and was found in the company of his mother during the trial. In addition, she had been less than cooperative with the prosecutor, refusing to tell him voluntarily what she knew about the gun admitted at trial. Although Ms. Bracy's repeated refusals to discuss the case with either the State or defense counsel made it difficult to pinpoint in what manner her proposed rebuttal testimony would relate to direct issues, her unique position with respect to the defendant and her vehement refusals to talk about the gun did sufficiently indicate that she had knowledge with respect to that crucial issue. In view of the relevant evidence she did in fact present with respect to the gun, it would indeed be ludicrous to find here that the foundation as to her testimony's relevancy to a direct issue was insufficient, especially when any need for speculation was entirely a product of the witness' wilful refusal to discuss the case except under penalty of law.

Defendant raises another issue as to Deborah Bracy's testimony. As already stated, Ms. Bracy testified that defendant had asked her to falsely claim ownership of the seized gun at trial. Defendant claims here that no foundation was laid for this impeaching statement and that it was therefore error for the court to allow it to be admitted.

■■■ Since defendant did not object to this testimony at trial or assert its admission as error in his post-trial motion, he has waived the issue for purposes of review. In addition, we note that although defendant was not asked if he had made this statement before Ms. Bracy's testimony was presented, the purpose behind this rule would not be advanced by finding error in this case. The purpose behind requiring a foundation for impeachment by a prior statement is to alert the witness (defendant), to avoid unfair surprise, and to give the witness a chance to explain. (*People v. Payton* (1966), 72 Ill. App. 2d 240, 218 N.E.2d 518.) The record affirmatively shows that the prosecutor was not attempting to create an unfair surprise or to deprive defendant of a chance to explain his making of the statement. Ms. Bracy had steadfastly refused to talk to the prosecutor about the gun prior to being put on the stand as a court's witness. Consequently, when the defendant was on the stand in his case-in-chief, the prosecutor was unaware of the subsequent impeachment testimony and thus could not have laid a foundation for it. Moreover, the defendant in surrebuttal denied making the statement, placing the issue in the very same perspective it would have been, had he been examined with respect to it on cross-examination.

The defendant's next contention is that the evidence is insufficient to sustain his convictions. He argues that Ms. Radosta's testimony was so improbable as to create a reasonable doubt of his guilt.

Although some of Ms. Radosta's professed actions following the alleged rape may not have been those of the classic rape victim, we find no basis for reversing defendant's conviction for aggravated assault and unlawful use of weapons. The trier of fact may believe part of one's testimony without believing all of it. *People v. Holverson* (1975), 32 Ill. App. 3d 459, 336 N.E.2d 88.

In order to reach verdicts on these offenses, the jury had to assess the relative credibility of Ms. Radosta and defendant since their testimony was in conflict. This is the jury's proper function in a criminal case. (*People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733.) The jury chose to believe Ms. Radosta with respect to the defendant's threatening her with a gun, and we will not disturb its verdicts. Where the evidence is merely conflicting a court of review will not substitute its judgment for that of the trier of fact. *People v. Akis*; *People v. Clark* (1964), 30 Ill. 2d 216, 195 N.E.2d 631. ██ There is ample evidence in the record to support the verdicts. Ms. Radosta testified that the defendant removed a small handgun from an inside pocket of his coat and pointed it at her head, saying "Get in the back and take off your clothes." When she pleaded with him, he threatened to shoot her. At this time, it was a sunny afternoon, and the two were very close, being in adjacent bucket seats in defendant's car. Ms. Radosta further testified that the real gun found in defendant's apartment looked like the one with which she was threatened. The defendant denied that this incident occurred during the ride and that he had any real weapons in his car. Rather, he attempted to imply that Ms. Radosta had merely seen a toy gun. The jury, however, was not compelled to accept defendant's version over the victim's. This is especially true since three toy guns, including one which was later taken back, were delivered to defense counsel in anticipation of trial. In addition, Ethel Lavine's testimony about the real gun which would have placed it in Chicago at the time of the .instant offense, was wholly contradicted by Deborah Bracy.

The defendant's next contention is that the verdicts of the jury are legally inconsistent. More specifically, he argues that his conviction of aggravated assault is inconsistent with his acquittal of the more serious offense of unlawful restraint in that the same act of pointing a gun at Ms. Radosta would support a guilty verdict as to the unlawful restraint offense.

██ █ The law in Illinois is well established that a verdict need not be logically consistent so long as it is not legally inconsistent. (*People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840, *cert. denied* (1971), 402 U.S. 972, 29 L. Ed. 2d 136, 91 S. Ct. 1658; *People v. Pickett* (1975), 34 Ill. App. 3d 590, 340 N.E.2d 259.) Furthermore, " 'In law there is no

inconsistency in verdicts of acquittal and conviction upon charges of crimes composed of different elements, but arising out of the same state of facts.' " (*People v. Hairston,* 46 Ill. 2d 348, 362, 263 N.E.2d 840, 849.) There is no question but that by statutory definition the crimes of aggravated assault (Ill. Rev. Stat. 1975, ch. 38, par. 12—2(a)(1)) and unlawful restraint (Ill. Rev. Stat. 1975, ch. 38, par. 10—3) are composed of different elements. It is our understanding that defendant does not challenge this fact but instead relies on the jury's inconsistency in acquitting him of one crime but not of another, both of which could be supported by the same act. At most this is a logical inconsistency; it does not present reversible error. A logical inconsistency does not equal a legal inconsistency. Such a verdict may well reflect nothing but an exercise by the jury of leniency. *People v. Pickett; People v. Hyman* (1972), 8 Ill. App. 3d 382, 290 N.E.2d 627.

Defendant's final contention is that he was denied his right to a speedy trial. We cannot agree.

On March 2, 1977, 121 days after the commencement of defendant's incarceration, defendant filed a motion for discharge on speedy trial grounds. (Ill. Rev. Stat. 1977, ch. 38, pars. 103—5(d) and (a).) On March 4, 1977, this motion was heard by the court and denied on the basis that the 120-day statutory period was tolled by defendant's February 15 motion for substitution of judges. The court stated for the record that the system by which cases in Jackson County are set for hearing is similar to that used in Cook County. More specifically, each judge in the county maintains an individual docket. When a judge recuses himself or a motion for substitution is granted, the case is returned to the presiding judge who reassigns the case to another judge for trial. A consequence of such reassignment may often be removal to another jury setting since the other judges need not give priority to the case over their already established dockets.

In the case at bar, the record establishes that defendant's motion for substitution of judges, presented on February 15, 1977, was immediately granted by Judge Richman. The motion, pursuant to section 114—5(c) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1977, ch. 38, par. 114—5(c)), sought substitution of Judge Richman with any other judge. The case was then returned to presiding Judge Kunce for reassignment. On February 23, 1977, Judge Kunce entered an order reassigning the case to himself. The order also noted that defendant's motion for substitution of judges and other motions necessitated that his cause be removed from the February jury setting. Defendant's trial was subsequently commenced on April 4, 1977.

■■ Since the instant offenses were committed prior to March 1, 1977, any delay occasioned by defendant would toll the running of the statutory period rather than temporarily suspending it for the time of the

delay. (*People v. Donalson* (1976), 64 Ill. 2d 536, 356 N.E.2d 776.) Since, also, defendant was tried well within 120 days of the final disposal of his motion, if the trial court properly attributed delay to him with respect to the motion for substitution of judges, defendant was not deprived of his right to a speedy trial.

■■ Our supreme court has repeatedly held that a motion for substitution of judges constitutes delay occasioned by the defendant which will toll the 120-day period. (*People v. Spicuzza* (1974), 57 Ill. 2d 152, 311 N.E.2d 112; *People v. Zuniga* (1973), 53 Ill. 2d 550, 293 N.E.2d 595.) We see no reason to depart from that principle here, especially since this motion undeniably started anew the administrative procedure of bringing defendant to trial. See *Spicuzza*, 57 Ill. 2d 152, 155, 311 N.E.2d 112, 114; *Zuniga*, 53 Ill. 2d 550, 554, 293 N.E.2d 595, 597.

■■ Defendant also asserts that it was error for Judge Richman to grant the motion for substitution without conducting a hearing on its merits, implying that had one been conducted the motion would have been denied. We agree with the trial court that defendant may not properly complain about the court's granting him the relief he sought. In addition, if defendant's motion had been held in abeyance for a hearing, it is quite likely that his trial would have had to be reset as it was here.

Finally, we turn to an additional issue raised by the State. Relying on *People v. Scott* (1977), 69 Ill. 2d 85, 370 N.E.2d 540, and *People v. Griffin* (1977), 56 Ill. App. 3d 255, 371 N.E.2d 1160, the State argues that the instant cause should be remanded to the trial court for the imposition of sentence upon the aggravated assault verdict.

In *People v. Scott*, our supreme court held that the appellate court is empowered through Supreme Court Rule 366(a) (Ill. Rev. Stat. 1977, ch. 110A, par. 366(a)) to remand a cause for the imposition of a sentence upon an incomplete judgment of conviction. Further, this court's recent holding in *People v. Dean* (1978), 61 Ill. App. 3d 612, 378 N.E.2d 248, that a trial court lacks authority to fail to impose any sentence on a properly entered judgment of conviction, would indicate that this court is required to correct any such error. "The effect of the remanding order for the imposition of sentence is to complete the circuit court's order and render the judgment final." *Scott*, 69 Ill. 2d 85, 89, 370 N.E.2d 540, 542.

■■ The record shows that judgment was entered on the guilty verdict of aggravated assault, but that it was not made final by the imposition of sentence thereon. We have already found the verdict to be supported by the evidence beyond a reasonable doubt. All that remains is to determine whether a sentence may properly be entered on the judgment of conviction. Although both of the instant offenses arise from the same general transaction, under the rule of *People v. King* (1977), 66 Ill. 2d 551, 566, 363 N.E.2d 838, 845, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273, concurrent sentences were proper since the offenses are

clearly not, by definition, lesser included offenses. Consequently, we must remand this cause for sentencing on the aggravated assault conviction. We need not express an opinion as to the propriety of consecutive sentences under subsections 5—8—4(a) and (b) of the Unified Code of Corrections (Ill. Rev. Stat. 1977, ch. 38, pars. 1005—8—4(a), (b)).

For the foregoing reasons, we affirm the judgment of the circuit court of Jackson County and remand this cause for the entry of a sentence on the conviction of aggravated assault.

Affirmed and remanded.

EBERSPACHER, P. J., and KARNS, J., concur.