(No. 69102.—

*In re* MARRIAGE OF STEPHEN W. O'NEILL, Appellant, and CAROLE SUE O'NEILL, Appellee.

*Opinion filed October 18, 1990.—Rehearing denied November 30, 1990.*

STAMOS, J., joined by MILLER, J., dissenting..

Duane D. Young and Mark Rabin, of Long, Rabin & Young, Ltd., of Springfield, for appellant.

Charles J. Gramlich and Mary Jo Egizii, of Springfield, for appellee.

JUSTICE CLARK delivered the opinion of the court:

The central issue in this case is whether a trial court, when dividing marital property in a proceeding for dissolution of marriage, should consider dissipation of marital

assets which occurred throughout the duration of the marriage, or should the trial court only consider dissipation which occurred during the time when the marriage was undergoing an irreconcilable breakdown.

On October 22, 1987, appellant, Stephen O'Neill, filed in the circuit court of Sangamon County a petition for dissolution of his marriage to appellee, Carole Sue O'Neill. On May 25, 1988, the circuit court granted the petition pursuant to section 401(a)(2) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1987, ch. 40, par. 401(a)(2)), on the grounds that irreconcilable differences between the parties caused an irretrievable breakdown of the marriage which further efforts at reconciliation would be unable to rectify. In its judgment of dissolution, the circuit court distributed the marital property and marital debts equally between Stephen and Carole.

According to the testimony of both Stephen and Carole, Stephen was arrested and charged with attempted rape in November 1983, almost four years before Stephen filed his petition for dissolution of marriage. At this time, Stephen told his wife that he was innocent of the charge. Carole believed him and arranged for an appointment with an attorney, Michael Metnick, for Stephen's defense. Metnick met with both Carole and Stephen and agreed to represent Stephen for $5,000. Metnick recommended that the O'Neills also retain another attorney, whose fee was $10,000. Although both Stephen and Carole were concerned about the expenses involved, they paid the additional $10,000 because they agreed that it was important for Stephen to have the best possible defense. The O'Neills paid the $15,000 in attorney fees from their joint savings, insurance money received as a result of an auto accident, and a loan of $7,000 they received from Carole's father. Carole was present at all the meetings between Stephen

and his attorneys, and she was aware of the evidence and the trial strategy Stephen's attorneys would use in the case.

In July 1984, Stephen was found guilty of the charge of attempted rape and was sentenced to four years' probation and 500 hours of public service. As a result of his charge and conviction, Stephen was fired from his job with the United States Postal Service. During the next few years, Stephen collected unemployment benefits and worked at various odd jobs, earning far less than he had been earning while working with the Postal Service.

Shortly after Stephen's arrest in November 1983, the O'Neills began receiving marriage counselling. There was very little evidence at trial concerning the condition of their marriage before the arrest. Carole did not testify as to the condition of their marriage before November 1983, while Stephen simply described it as "just an average marriage, I guess."

In the spring of 1985, during one of these marriage counselling sessions, Stephen confessed for the first time to Carole that he had committed the attempted rape for which he had been convicted in 1984. Until this confession, Stephen had always told his wife that he was innocent of the charge and she had believed him. Although the O'Neills' marital problems persisted, they continued living together for approximately 1½ more years after the confession. In December 1986, Stephen moved out of the marital residence.

Carole testified that her agreement to spend the $15,000 in attorney fees rested on her belief in her husband's claim that he was innocent of the charge of attempted rape. However, in response to the trial judge's question of whether she "believe[d] that [she] would have spent that money if [she] knew at the time of his guilt," Carole stated that "I have given that a lot of thought, and I honestly don't know."

Carole argued that the $15,000 spent on attorney fees constituted dissipation of marital assets chargeable to Stephen. According to Carole, in dividing marital property during a proceeding for dissolution of marriage, courts should consider dissipation which occurred throughout the course of a marriage. The $15,000 expenditure, Carole claimed, constituted Stephen's dissipation of marital assets because it was necessitated by Stephen's wrongful actions in attempting a rape. Carole also argued that Stephen should be charged with dissipation because, to induce Carole to authorize the spending of the $15,000, Stephen defrauded his wife in claiming that he was innocent.

Stephen attempted to refute Carole's dissipation claim by arguing that case law defines dissipation as " ' "use of marital property for the sole benefit of one of the spouses for a purpose unrelated to the marriage at a time that the marriage is undergoing an irreconcilable breakdown" ' " (*In re Marriage of Petrovich* (1987), 154 Ill. App. 3d 881, 886, quoting *In re Marriage of Smith* (1984), 128 Ill. App. 3d 1017, 1019). The $15,000 expenditure for attorney fees, according to Stephen, was incurred at a time before the O'Neills' marriage had undergone an irreconcilable breakdown. (Carole does not dispute Stephen's claim that the expenditure occurred before the marriage had undergone an irreconcilable breakdown.) Stephen further argued that Carole acquiesced to the $15,000 expenditure at the time it was made and never asked for reimbursement after Stephen's confession. Finally, Stephen argued that Carole could not claim to have been defrauded because Carole's own testimony indicated that she did not know if she would have authorized the expenditure had she known Stephen was guilty.

The trial court held that the $15,000 expenditure did not constitute dissipation by Stephen. The trial court explained:

"The Court is inclined to agree with the wife's argument that a spouse does not make a knowing expenditure of funds for attorney's fees when the guilty husband maintains his innocence. However, the Court cannot find an actual dissipation of marital assets in this case because when the wife was asked if she would have spent those funds if she had the full knowledge necessary to make the decision, that is if she knew that he was guilty, she did not know if she would have made the expenditure or not. The Court appreciates the witness' candor but, without a clear statement that the funds would not have been authorized by her if she had known the true circumstances, the Court cannot find that a dissipation has occurred."

The fact that the trial court considered whether dissipation actually occurred in this case indicates that the trial court accepted Carole's argument that courts, in distributing marital property, should consider dissipation which occurred throughout a marriage, rather than simply dissipation which occurred after an irreconcilable breakdown.

The appellate court similarly held that a court may consider dissipation that occurred throughout a marriage, but reversed the trial court's finding that dissipation did not occur in this case. (185 Ill. App. 3d 566, 568-69.) According to the appellate court, the rule that dissipation can only occur after an irreconcilable marital breakdown is not supported by the language of the Illinois Marriage and Dissolution of Marriage Act (the Act) (Ill. Rev. Stat. 1987, ch. 40, par. 101 *et seq.*). The appellate court noted that the Act, in stating that courts are to consider the "contribution or dissipation of each party" (Ill. Rev. Stat. 1987, ch. 40, par. 503(d)(1)) when dividing marital property, does not indicate that the time

during which dissipation can occur should be limited to the time when a marriage is undergoing an irreconcilable breakdown. Furthermore, according to the appellate court, nothing in the legislative history of the Act supports the "irreconcilable breakdown" rule. Finally, the appellate court stated that none of the cases applying the "irreconcilable breakdown" rule had presented any analysis to support such a rule. (185 Ill. App. 3d at 568-69.) The appellate court therefore held that courts in dissolution of marriage proceedings should consider dissipation which occurred throughout the duration of a marriage. (185 Ill. App. 3d at 568.) We granted Stephen's petition for leave to appeal (107 Ill. 2d R. 315(a)).

Stephen argues that the appellate court was incorrect in holding that courts, in dividing marital property in dissolution of marriage proceedings, may consider dissipation which occurred throughout the course of a marriage. Stephen also argues that even if the appellate court was correct on this first point, the appellate court erred in finding that the $15,000 expenditure for attorney fees at issue in this case constituted dissipation.

Section 503 of the Act sets forth the factors which a court must consider when distributing marital property. Subsection (c) of section 503 as it was originally enacted in 1977 provided that, among the factors to be considered in distributing marital property, was:

> "(1) the contribution or dissipation of each party in the acquisition, preservation, or depreciation or appreciation in value, of the marital and non-marital property, including the contribution of a spouse as a homemaker or to the family unit." Ill. Rev. Stat. 1977, ch. 40, par. 503(c).

One of the first appellate cases construing section 503(c) of the Act was *Klingberg v. Klingberg* (1979), 68 Ill. App. 3d 513. In *Klingberg*, the court held that the

trial court's finding that the respondent did not dissipate marital assets was contrary to the manifest weight of the evidence because the evidence indicated that the respondent "use[d] marital property for his sole benefit and for a purpose unrelated to the marriage, at a time that the marriage was undergoing an irreconcilable breakdown." (*Klingberg*, 68 Ill. App. 3d at 517.) Other appellate court decisions subsequently cited *Klingberg* in concluding that the term "dissipation" as used in section 503(c) of the Act as originally enacted meant a spouse's use of marital property for the spouse's own benefit and for a purpose unrelated to the marriage at a time when the marriage was undergoing an irreconcilable breakdown. See *In re Marriage of Hellwig* (1981), 100 Ill. App. 3d 452, 462; *In re Marriage of Schriner* (1980), 88 Ill. App. 3d 380, 385.

On January 1, 1982, section 503 was amended to add a new paragraph pertaining to common ownership of property. This new paragraph became subsection (c), and the language of former subsection (c) became subsection (d). (See Ill. Rev. Stat. 1981, ch. 40, par. 503(d) (as amended by Pub. Act 82—668, eff. January 1, 1982).) Soon thereafter, the appellate court in *In re Marriage of Block* (1982), 110 Ill. App. 3d 864, 870, again interpreted the term "dissipation" as used in the recently amended Act as meaning a spouse's use of "marital property for the [spouse's] own benefit and for a purpose unrelated to the marriage at a time in which the marriage is undergoing an irreconcilable breakdown."

On August 19, 1983, section 503 was again substantially amended. (See Ill. Rev. Stat. 1983, ch. 40, par. 503 (as amended by Pub. Act 83—129, eff. August 19, 1983).) These amendments were a response by the General Assembly to remedy what it perceived to be this court's incorrect holding in *In re Marriage of Smith* (1981), 86 Ill. 2d 518, 529, that section 503 was intended to create a

rule that "where a spouse who holds nonmarital property causes it to be commingled with marital property, or with nonmarital property of the other, \*\*\* the commingled property is presumed to be marital property." (See Ill. Ann. Stat., ch. 40, par. 503, Supplement to Historical & Practice Notes, at 61 (Smith-Hurd Supp. 1990).) However, the language of subsection (d) pertaining to contribution and dissipation of marital assets remained unchanged. See Ill. Rev. Stat. 1983, ch. 40, par. 503(d) (as amended by Pub. Act 83—129, eff. August 19, 1983).

The appellate court, until the decision in this case, continued to interpret the term "dissipation" as pertaining only to the improper use of marital assets after a marriage has begun an irreconcilable breakdown. (See, e.g., *In re Marriage of Click* (1988), 169 Ill. App. 3d 48, 55; *In re Marriage of Partyka* (1987), 158 Ill. App. 3d 545, 549; *In re Marriage of Aslaksen* (1986), 148 Ill. App. 3d 784, 788; *In re Marriage of Aud* (1986), 142 Ill. App. 3d 320, 331.) During this time, the General Assembly continued to amend section 503. (See, e.g., Pub. Act 83—563, eff. January 1, 1984 (amending Ill. Rev. Stat. 1983, ch. 40, par. 503; adding subsection which empowers courts to make judgments affecting marital property).) Nevertheless, the General Assembly has left the language of subsection (d) unchanged. See Ill. Rev. Stat. 1987, ch. 40, par. 503(d).

It is a well-established principle of statutory construction that "where terms used in [a] statute have acquired a settled meaning through judicial construction and are retained in subsequent amendments or re-enactments of the statute, they are to be understood and interpreted in the same sense theretofore attributed to them by the court unless a contrary intention of the legislature is made clear." (*People ex rel. Nelson v. Wiersema State Bank* (1935), 361 Ill. 75, 78-79; see also *People v. Badoud* (1988), 122 Ill. 2d 50, 55-56; *Gaither v. Lager*

(1954), 2 Ill. 2d 293, 301; 2A N. Singer, Sutherland on Statutory Construction §49.10, at 400-01 (Sands 4th ed. 1986).) This rule is based upon the view that "the judicial construction [of a statute] becomes a part of the law, and it is presumed that the legislature in passing the law knew [of] such construction of the words in the prior enactment." *Wiersema State Bank*, 361 Ill. at 79.

A related principle of statutory construction is that "[w]here the legislature chooses not to amend a statute after a judicial construction, it will be presumed that it has acquiesced in the court's statement of the legislative intent." *Miller v. Lockett* (1983), 98 Ill. 2d 478, 483; see also *People ex rel. Boylan v. Illinois Central Gulf R.R. Co.* (1978), 72 Ill. 2d 387, 393; *People v. Hairston* (1970), 46 Ill. 2d 348, 353.

These principles, when applied to section 503 of the Act, compel us to conclude that the General Assembly intended for the term "dissipation" to refer only to a spouse's improper use of marital property during the time in which the marriage is undergoing an irreconcilable breakdown. These principles of statutory construction are particularly relevant here where the General Assembly has repeatedly amended section 503 and, in one instance, actually changed section 503 to remedy what it perceived to be an improper judicial construction of the statute. (See Ill. Ann. Stat., ch. 40, par. 503, Supplement to Historical & Practice Notes, at 61 (Smith-Hurd Supp. 1990).) Because the General Assembly has retained the identical language pertaining to dissipation that was used when the statute was originally enacted, rather than changing the language in response to the judiciary's construction of the statute (as the General Assembly did in response to this court's construction of section 503 in *Smith*, 86 Ill. 2d 518), we conclude that the numerous judicial decisions limiting dissipation to the time during which a marriage is undergoing an irreconcilable break-

down properly ascertained the General Assembly's intent.

We therefore hold that the term "dissipation," as used in section 503(d)(1) of the Illinois Marriage and Dissolution of Marriage Act, refers to the "use of marital property for the sole benefit of one of the spouses for a purpose unrelated to the marriage at a time that the marriage is undergoing an irreconcilable breakdown." (*In re Marriage of Petrovich* (1987), 154 Ill. App. 3d 881, 886.) Accordingly, because there is no claim here that the $15,000 expenditure for attorney fees occurred during the time that the O'Neills' marriage was undergoing an irreconcilable breakdown, that expenditure did not constitute dissipation of marital assets.

For the reasons stated herein, we reverse the judgement of the appellate court, and affirm the circuit court's finding that the $15,000 expenditure for attorney fees did not constitute dissipation.

*Appellate court reversed;*
*circuit court affirmed.*

JUSTICE STAMOS, dissenting:

The majority has failed to apply the correct principles of statutory construction to section 503(d)(1) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1987, ch. 40, par. 503(d)(1)). In my opinion, the plain and unambiguous language of section 503(d)(1) mandates the conclusion that a trial court consider a spouse's dissipation of marital assets that occurs at any time during the marriage, not merely during the irreconcilable breakdown stage of a marriage. Because the majority in this case has chosen to rely solely on the judicial-construction rule and has chosen to ignore the fundamental principle that courts are to give effect to plain and unambiguous statutory language (*County of*

*Du Page v. Graham, Anderson, Probst & White, Inc.*
(1985),·109 Ill. 2d 143, 151), I dissent, respectfully.

The goal of the courts in construing statutes, which all rules of statutory construction are formulated to achieve, is the ascertainment of the legislature's intent in enacting a particular statute and effectuation of that intent in a particular case. (*E.g., People v. Boykin* (1983), 94 Ill. 2d 138, 141.) The duty of the courts, including this court, is to interpret the laws made by the legislature, not to make the law themselves. *E.g., Bates v. Board of Education, Allendale Community Consolidated School District No. 17* (1990), 136 Ill. 2d 260, 267; *Franzese v. Trinko* (1977), 66 Ill. 2d 136, 140.

To ascertain the legislature's intent, this court has repeatedly and unequivocally stated that "[c]ourts should first look to the statutory language as the best indication of the intent of the drafters" (*County of Du Page*, 109 Ill. 2d at 151; accord *Boykin*, 94 Ill. 2d at 141) and that "legislative intent should be sought primarily from the language used in the statute" (*Certain Taxpayers v. Sheahen* (1970), 45 Ill. 2d 75, 84; accord *People ex rel. Scott v. Schwulst Building Center, Inc.* (1982), 89 Ill. 2d 365, 371). If the language of the examined statute is plain and unambiguous, "and where that intent can be ascertained from the language of the statute, it will be given effect without resorting to other aids for construction. [Citations.]" (*People v. Robinson* (1982), 89 Ill. 2d 469, 475-76; accord *County of Du Page*, 109 Ill. 2d at 151; *Kozak v. Retirement Board of the Firemen's Annuity & Benefit Fund* (1983), 95 Ill. 2d 211, 215-16; *Bovinette v. City of Mascoutah* (1973), 55 Ill. 2d 129, 133.) Traditionally, this court has declined to search beyond the plain and unambiguous language of a statute, recognizing that " '[t]here is no rule of construction which authorizes a court to declare that the legislature did not mean what the plain language of the statute im-

ports' " (*People ex rel. Scott*, 89 Ill. 2d at 371, quoting *Western National Bank v. Village of Kildeer* (1960), 19 Ill. 2d 342, 350), and also recognizing that "[w]here the language of the act is certain and unambiguous the only legitimate function of the courts is to enforce the law as enacted by the legislature. [Citations.] It is never proper for a court to depart from plain language by reading into a statute exceptions, limitations or conditions which conflict with clearly expressed legislative intent. [Citations.]" *Certain Taxpayers*, 45 Ill. 2d at 84.

The rule that, if a statute's commands are expressed in plain and unambiguous language, the courts are to effectuate those commands without searching elsewhere for legislative intent has been declared by this court to be "the first test for statutory interpretation." (*Fitzsimmons v. Norgle* (1984), 104 Ill. 2d 369, 373.) Yet in the present case the majority has seen fit to ignore the plain-meaning rule. Rather, without even attempting to interpret the language of section 503(d)(1) for itself, the majority has applied what is called the judicial-construction rule and uncritically bound itself to interpretations of section 503(d)(1) made by some panels of the appellate court.

When "the first test of statutory construction" is applied to section 503(d)(1), it is immediately evident that the language of section 503(d)(1) is plain and unambiguous and that the construction of section 503(d)(1)'s plain language by some panels of the appellate court, which the majority has unquestioningly adopted, is wrong. Section 503(d)(1) states that a court:

"(d) *** shall divide the marital property without regard to marital misconduct in just proportions considering all relevant factors, including:

(1) the contribution or dissipation of each party in the acquisition, preservation, or depreciation or appreciation

in value, of the marital and non-marital property ***."
(Ill. Rev. Stat. 1987, ch. 40, par. 503(d)(1).)

It would be difficult to write this statute in plainer or less ambiguous terms regarding the issue of whether a court is to consider dissipation that occurs at any time during a marriage or only such dissipation as occurs during the irreconcilable breakdown stage of a marriage.

Strikingly absent from section 503(d)(1) is any time constraint—any provision that the factors of "contribution or dissipation" are relevant only if they occur during a certain time or stage of a marriage. It confounds reason to read into this statute a time constraint, particularly one defined by such unique terms as the irreconcilable breakdown stage of a marriage, where the statute contains not a hint of such a limitation on its applicability. Therefore, when one reads the appellate court decisions cited by the majority (138 Ill. 2d at 495), one is astonished to find that this irreconcilable breakdown limitation has been imposed on dissipation.

Another obvious characteristic of section 503(d)(1) is the juxtaposition of the terms "dissipation" and "contribution" and their linkage by the conjunction "or." Consequently, both terms relate equally to the words "marital and non-marital property." Plainly, then, a court is to treat dissipation of and contribution to marital and non-marital property in an identical manner. Without doubt, section 503(d)(1) does not authorize a court to take account of contributions that occur at any time during a marriage but consider only those dissipations that occur during the final, irreconcilable breakdown stage of a marriage. Yet the trial courts have been treating contribution and dissipation in precisely this disparate manner, with the approval of some panels of the appellate court. See, *e.g.*, *In re Marriage of Petrovich* (1987), 154 Ill. App. 3d 881.

Additional significant language in section 503(d)(1), from which legislative intent can be discerned, is the directive that marital property be divided "in just proportions." If, in spite of the absence of any time limitation in section 503(d)(1), there were still a question as to whether or not the legislature intended that dissipation be accounted for only if it occurs during the irreconcilable breakdown stage of a marriage, that question would be answered by this instruction to courts that they divide marital property in just proportions. Clearly, it would not be just for a court to eschew consideration of one spouse's dissipative acts, for example, gambling, because they occurred before a marriage had irreconcilably broken down, yet reduce the other spouse's share of marital property because he or she had gambled while the marriage was irreconcilably breaking down. Nor, in my opinion, will a court succeed in dividing marital property in just proportions if it refuses to take account of one spouse's actions which constitute dissipation in all respects except for not being taken while the marriage was irreconcilably breaking down. Nonetheless, the majority's opinion sanctions both economically unjust results.

If the majority had followed this court's consistent pronouncements on the procedure to be used in construing statutes, and thus had first examined section 503(d)(1) to determine if it contained plain language to resolve the issue of whether a trial court is to consider only dissipation occuring during the irreconcilable breakdown stage of a marriage, the majority would have found that section 503(d)(1)'s plain language left no room for insertion of such a limitation. Proceeding in its application of those time-honored rules of statutory construction, the majority would have declined to use additional aids to construction in order to divine any other purported evidence of the legislature's intent and would

have based its holding solely on the plain language of section 503(d)(1), without "reading into [the] statute exceptions, limitations or conditions which conflict with the clearly expressed legislative intent." (*Certain Taxpayers*, 45 Ill. 2d at 84; see *Fitzsimmons*, 104 Ill. 2d at 373 (only if statute is ambiguous is court to look at reason for and objects of statute); *Kozak*, 95 Ill. 2d at 214-15 (where statute's words are plain and unambiguous, courts should not search for legislative intent that is not readily apparent); *Boykin*, 94 Ill. 2d at 141 (where statute's language is clear it is to be given effect without resorting to other aids to construction); *Bovinette*, 55 Ill. 2d at 133 (courts cannot read into statute words that are not within legislature's plain intention as determined from statute itself).) Rather than abiding by our traditional procedures, though, the majority has chosen to base its decision solely on a rule of judicial construction, which is inappropriate to the circumstances of the present case; in so doing, the majority has ignored not merely the plain-meaning rule, but also all other valid methods of ascertaining legislative intent—for instance, examining the legislative history of a statute (the legislative history of section 503 shows the legislature's goal to have been achieving fair and equitable division of marital property). See *People v. Badoud* (1988), 122 Ill. 2d 50 (only after finding legislative intent from other facts did court discuss rule of judicial construction as supporting its conclusion).

Before discussing why the judicial-construction rule cannot properly be applied in this case, I wish to note the apparent origin of the misconstruction of section 503(d)(1)'s dissipation provision by some panels of the appellate court, which the majority today perpetuates. In *Klingberg v. Klingberg* (1979), 68 Ill. App. 3d 513, 517, the court stated that the respondent had dissipated marital funds because his "action was designed to use mari-

tal property for his sole benefit and for a purpose unrelated to the marriage, at a time that the marriage was undergoing an irreconcilable breakdown." This statement should have been seen as the fact-specific statement it was—in *Klingberg* the dissipation had just happened to occur during the marriage's irreconcilable breakdown. The court did not cite any authority for the proposition that dissipation could occur only while a marriage is undergoing an irreconcilable breakdown. But panels of the appellate court have unwisely treated this statement as definitive of the term "dissipation." (See cases cited by the majority, 138 Ill. 2d at 495, all of which rely on *Klingberg* directly or indirectly.) Thus, by citing *Klingberg* and each other, and by neglecting to examine the plain language of section 503(d)(1), panels of the appellate court, with the exception of the fourth district in the present case, have established this condition of irreconcilable breakdown. The majority's chosen approach in this case has served to perpetuate that mistake.

The majority actually discusses two judicial construction rules, and it is unclear which rule it relies upon for its holding. Regardless, the majority's reliance on either rule is inappropriate in the present case. The first rule discussed can be called the reenactment-amendment judicial-construction rule: When certain words in a statute are judicially construed and are subsequently retained in amendments or reenactments of that statute, it will be presumed that the legislature intended those words, as they appear in the statute originally and in the reenactment and amendment, to mean what the court had construed them to mean. The second rule can be called the legislative-inaction judicial-construction rule: when certain words in a statute are judicially construed and the legislature fails to amend (or reenact) that statute, it will

be presumed that the legislature acquiesced in the meaning declared by the court.

The reenactment-amendment rule does not apply to the present case because, traditionally, this court has applied it only when, as the majority itself states, the judicially construed statutory language is " 'retained in subsequent amendments or re-enactments of the statute.' " 138 Ill. 2d at 495, quoting *People ex rel. Nelson v. Wiersema State Bank* (1935), 361 Ill. 75, 78-79 (where court did not apply rule to case); see 1A, 2A N. Singer, Sutherland on Statutory Construction §§22.33, 22.35, 49.09, at 287-88, 296, 400 (Sands 4th ed. 1986) (rule applies if statute is reenacted and construed words are repeated without change or if words are included in an amendment).

In *Union Electric Co. v. Illinois Commerce Comm'n* (1979), 77 Ill. 2d 364, 380-81, this court expressed reluctance in applying the rule in any cases but those where the legislature's failure to reword a provision that had been judicially construed provided particularly compelling evidence of legislative intent to adopt the judicial construction. This court acknowledged the argument that mere inaction by a legislature does not alone indicate acquiescence to a judicial construction; but this court explained that the circumstances involved in *Union Electric* strongly indicated that the legislature's inaction constituted implicit agreement with the judicial finding of the legislature's intent in enacting the statute. The circumstances in *Union Electric* differ notably from those in the present case. This court had construed the statutory term at issue in *Union Electric* to have the same meaning in numerous cases over a period of 60 years, during which time the statute had been reenacted once and amended several times; yet during all those years the legislature had not indicated any disagreement with this court's construction of the statute. This court

thought that, under those circumstances, for it to construe the term to have any other meaning would amount to judicial amendment of the statute. (See *Morandi v. Heiman* (1961), 23 Ill. 2d 365 (judicial-construction rule applied to absentee ballot provision of election laws, which had been construed numerous times by this court before legislature reenacted it unchanged); *Osborn v. Village of River Forest* (1961), 21 Ill. 2d 246 (statute reenacted without change to provision that had been previously construed by this court); *City of Champaign v. City of Champaign Township* (1959), 16 Ill. 2d 58 (same); *People ex rel. Oller v. Missouri Pacific R.R. Co.* (1944), 388 Ill. 271 (same).) Even the holding in *Miller v. Lockett* (1983), 98 Ill. 2d 478, erroneously cited by the majority as authority for the legislative-inaction judicial-construction rule, rested on this court's finding evidence of legislative intent in the General Assembly's reenactment of a statute, which this court had previously construed, without altering the construed words. Thus, *Miller*, far from supporting the legislative-inaction judicial-construction rule, in fact further establishes that for the reenactment-amendment judicial-construction rule to be applied the statute has either to have been reenacted without the legislature's altering the construed words or to have been amended by an enactment that incorporates the construed words.

Section 503(d)(1) has not been reenacted. Nor has the legislature included the term "dissipation" in any amendment to section 503(d)(1). (*Cf. Gaither v. Lager* (1954), 2 Ill. 2d 293 (statute entitled an amendatory act expressly required "notice" as defined by another statute; this notice provision had previously been construed by supreme court and not changed by legislature since).) Therefore, the reenactment-amendment rule of judicial construction does not apply in the present case.

If the majority's holding is actually based on the second rule of judicial construction it discusses—the legislative-inaction rule—the majority has unwisely extended that rule's application to judicial constructions by the appellate court. The majority cites three cases which it believes establish the legislative-inaction rule as a valid principle of statutory construction. I have already explained that *Miller* did not apply this rule. The other cases both involved this court's, not the appellate court's, repeated and consistent constructions of certain statutory provisions; in the years following this court's constructions of the statutes at issue in those cases, the legislature neither reenacted the statutes without changing the construed terms or incorporated those terms into an amendment to the statute, and thus did not express implicit approval of this court's construction, nor passed legislation changing those statutory terms construed by this court, and thus did not express disapproval of this court's construction. *People ex rel. Boylan v. Illinois Central Gulf R.R. Co.* (1978), 72 Ill. 2d 387; *People v. Hairston* (1970), 46 Ill. 2d 348.

It is significant that *Boylan* and *Hairston* depended on prior judicial constructions by this court and not the appellate court. In those cases this court had, in earlier decisions, already performed its duty of saying what the law meant. Thus, when asked to review its construction of the same statutory provision, if this court continued to agree that the law meant what it had previously said the law meant, or was disinclined to contravene *stare decisis* (see *Williams v. Crickman* (1980), 81 Ill. 2d 105, 111), the only remaining question was whether the General Assembly had recently expressed an intent that the law have a different meaning. (*Cf. Bates v. Board of Education, Allendale Community Consolidated School District No. 17* (1990), 136 Ill. 2d 260 (legislative action indicating disagreement with the judicial construction given

prospective effect only).) Finding no such legislative expression, this court proceeded to reaffirm its prior construction.

Critically different is the situation in the present case where, without having ever deduced the meaning of section 503(d)(1)'s dissipation provision for itself after examining the text and applying the well-used rules of statutory construction, the majority has reflexively applied a rule of judicial construction and thereby uncritically and mechanically adopted the constructions made by panels of the appellate court. The majority has abdicated this court's duty to interpret the law.

Justice Goldenhersh called the legislative-inaction judicial construction rule "quaint, intriguing, but legally unsound"; he further observed that when only the appellate court has ruled on the meaning of a statute, rather than concluding that the legislature acquiesced to these rulings because it did not manifest its disapproval, "[a] much more sensible interpretation of legislative inaction, and one far more flattering to the General Assembly, is that being reasonable individuals they waited to see whether this court would resolve the conflict." (*Kobylanski v. Chicago Board of Education* (1976), 63 Ill. 2d 165, 177 (Goldenhersh, J., dissenting, joined by Ward, C.J., and Schaefer, J.) (primary basis for majority's holding was plain language of statute, with judicial construction rule used merely as added support).) I agree with the *Kobylanski* dissenters' characterization of the legislative-inaction judicial construction rule. Though I grant that the rule may have some pertinence when statutory language is ambiguous and other aids to construction fail to clearly illuminate legislative intent, in this case the majority's reliance on the rule as sole indicator of legislative intent is unreasonable.

Whichever rule of judicial construction the majority has applied in the present case, its action is remarkable

for its total disregard of all other traditionally accepted evidence of statutory meaning and legislative intent. After all, both rules are presumptions. (See 138 Ill. 2d at 496.) But the majority treats these presumptions as irrebutable by ignoring, out of apparent disinterest, section 503(d)(1)'s text, its legislative history, or any other possible evidence of its meaning. By contrast, in each of those cases the majority cites as support for the reenactment-amendment rule of judicial construction, this court used the rule as a supplemental method of statutory construction, not as the sole basis for its holding.

The majority's complete and utter reliance on a rule of judicial construction for its holding in this case is noteworthy for one other reason: The majority neither provides, nor apparently sought, any evidence that the General Assembly was aware of those appellate court decisions that imposed on the concept of dissipation the condition that it occur during a marriage's irreconcilable breakdown. As one commentator noted, "[t]he acquiescence of the legislature seems to be of small consequence where the statute or its contemporaneous interpretation was not called to the legislature's attention." (2A N. Singer, Sutherland on Statutory Construction §49.10, at 408 (Sands 4th ed. 1986).) This commonsense observation is especially apt where, as here, the statutory provision at issue has been construed only by the appellate court, whose pronouncements it can reasonably be presumed the General Assembly are far less likely to be noted by the General Assembly than are the pronouncements of this court.

In my opinion, the majority would do well to heed the caution that "[w]e are indeed treading on dangerous ground when we purport to judge the judicial soundness of our prior opinions by the presence or absence of corrective legislation." (*Nudd v. Matsoukas* (1956), 7 Ill. 2d 608, 615; see also *Helvering v. Hallock* (1940), 309 U.S.

106, 119-21, 84 L. Ed. 2d 604, 612-13, 60 S. Ct. 444, 451-52 (in reconsidering two of its prior decisions, Court stated "we walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle," especially when there is no evidence that Congress was aware of Court's prior statutory constructions).) The intellectual footing is far more perilous in this case, where the majority has judged the soundness not of our prior opinions but of the appellate court's opinions by the General Assembly's failure to enact legislation disapproving those opinions.

In conclusion, I believe that by latching onto a rule of judicial construction as the sole basis for its holding in this case, and by declining to analyze the text of section 503(d)(1) for itself, the majority has not merely failed to effectuate the intent of the legislature in regard to the just division of marital property as it is plainly and unambiguously expressed by that text; the majority has also unwisely announced a new approach to statutory construction which will impede the search for statutory meaning in the future. Furthermore, the majority has abdicated this court's responsibility for interpreting the law to the appellate court and to the fiction of an omniscient legislature whose intent at the time it enacts a law can be determined from the fact that in subsequent years the legislature does not expressly disapprove appellate court constructions of that law. I cannot approve.

JUSTICE MILLER joins in this dissent.