2019 IL App (1st) 181947
Nos. 1-18-1947 & 1-19-0178 (cons.)
Order filed November 18, 2019

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | |
|---|---|
| *In re* MARRIAGE OF SLATER, | Appeal from the Circuit Court of Cook County. |
| (JOHN SLATER, | |
| Petitioner-Appellant, | No. 17 D 2157 |
| and | |
| KATHLEEN SLATER, | The Honorable David Haracz, |
| Respondent-Appellee). | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court.
Presiding Justice Griffin and Justice Pierce concurred in the judgment.

**ORDER**

¶ 1      *Held*: Issue regarding the determinative dates of the premarital agreement for classifying property as marital or non-marital was forfeited when party did not appeal the trial court's declaratory judgment ruling after the trial court added Illinois Supreme Court 304(a) language. The trial court properly allocated the parties' multiple bank accounts as marital/non-marital; ordered reimbursement of the marital estate for various monies used by one party in violation of the terms of the premarital agreement; and ordered an income tax refund shared in equal parts as the parties had agreed.

¶ 2          Kathleen and John Slater married one week after signing a prenuptial agreement. Eighteen months later, Kathleen filed for divorce. Four months later, she dismissed her petition. Eight days after that, John filed a petition for dissolution.

¶ 3          John moved for partial summary judgment, arguing that under the prenuptial agreement the determinative dates for defining marital property should be the date the parties married and the date Kathleen filed for divorce. John also asked the court to consider other issues.

¶ 4          In response, Kathleen moved for declaratory judgment to set the time frame for defining marital property. She argued that under the prenup the relevant time period should end on the date John filed his petition for dissolution, the filing that ultimately lead to the parties' divorce. The trial court ruled on the declaratory judgment in Kathleen's favor, finding the date John filed for dissolution the relevant end date. The trial court denied John's motion for partial summary judgment.

¶ 5          After a bench trial, the trial court entered judgment for dissolution of marriage. John filed a motion for reconsideration, which the trial court denied. John appeals from both orders.

¶ 6          We affirm. John forfeited his argument regarding the effective end date for enforcing the prenup by not appealing the declaratory judgment ruling after obtaining Supreme Court Rule 304(a) language. On the other issues John has raises on appeal, the trial court properly ruled.

¶ 7                                              Background

¶ 8                                        *Premarital Agreement*

¶ 9          John and Kathleen signed a "Premarital Agreement" that took effect on the date of the marriage, May 2, 2015. Paragraph 3, entitled "Non-marital Property and Transmutation," provided "the following items shall be deemed Non-Marital Property, whether acquired by the applicable party before or during marriage," unless a written and signed memorandum

demonstrates an intent to gift his or her property and "transmute it to marital property." Paragraph 3(E) included as non-marital property "[a]ll earnings, income, and other benefits derived from property designated as such party's schedule of property interests attached to this Agreement." Attached were Schedule A listing John's non-marital assets and liabilities and Schedule B listing Kathleen's.

¶ 10　　Paragraph 3(G) included as non-marital property either owned with "one or more other persons, none of whom is the other party," and paragraph 3(J) included "[i]ncome, including but not limited to salary, severance salary, dividends, distributions, deferred income, options (vested and non-vested), grants (vested and non-vested) and retirement benefits received by either party from any source resulting from that party's personal efforts or otherwise during the marriage, *unless added to a joint account as described in paragraph 5 of this Agreement.*" (Emphasis in original.)

¶ 11　　In paragraph 3(K), the parties agreed that each could seek reimbursement to marital funds for the value of "marital funds or assets used to purchase, improve, maintain or otherwise contribute to the value of a party's non-marital property without the express written consent of the other party." Additionally, the parties agreed that each would be reimbursed for the full amount of $10,000 or more of his or her Non-Marital Property used for a down payment or improvement to any co-owned real property, "unless otherwise agreed by the parties in writing prior to the proceeds from the sale of such property being divided." A contribution less than $10,000 would not be reimbursed unless the parties agreed otherwise in writing.

¶ 12　　Paragraph 5 covered "Joint Household and Future Joint or Marital Property." Paragraph 5(E)(1) provided: "*Bank Accounts* – Separate accounts held at the date of marriage shall remain separate property. The parties intend to establish joint accounts which shall become marital

property." Paragraph 5(E)(2) read: "*Investment accounts* – Separate accounts held at the date of the marriage shall remain separate property. The parties intend to establish joint accounts which shall become marital property." Section 5(E)(3) concerned earnings an employer actually paid "during the marriage and before either party files for divorce." This section also included language pertaining to stock John received as part of his executive compensation. Paragraph 5(E)(4) regarding "*Retirement Accounts*" added the term "Non-Marital"—"Separate accounts held at the date of the marriage shall remain separate Non-Marital Property."

¶ 13    The four subsections of paragraph 5(E) included the qualifier "if the marriage is dissolved," in which case John and Kathleen would each own one-half.

¶ 14                                Litigation

¶ 15    On November 28, 2016, Kathleen petitioned for dissolution of marriage. She withdrew her petition on March 1, 2017. John filed his petition for dissolution eight days later.

¶ 16    John moved for partial summary judgment, contending the time to determine joint property should begin on the date of the marriage and end on the date Kathleen filed for dissolution. He argued the prenup did not specify a petition for dissolution had to result in divorce and had the parties intended that a petition had to lead to a final judgment of separation or divorce, they could have included appropriate language. Kathleen petitioned the court for a declaratory judgment, contending that the dates should instead be the date of the marriage until John filed in March 2017.

¶ 17    The trial court denied John's motion for partial summary judgment and granted Kathleen's declaratory judgment motion, stating, "I don't think it's sensible that it could be a filing that doesn't lead to a dissolution." The written order entered November 22, 2017, said,

"the court declares that the relevant date for determination or marital/non-marital property is March 9, 2017 if the filing results in a dissolution of marriage."

¶ 18    John asked the court to add Illinois Supreme Court Rule 304(a) language stating the order was final and appealable. John did not appeal from the November 22 order.

¶ 19                                    *Stipulations*

¶ 20    Before trial on the remaining issues, the parties stipulated that (i) John and Kathleen were employed and self-sufficient; (ii) the "Prenuptial Agreement" was a valid and enforceable contract; and (iii) John had paid the down payment plus closing costs for their home, which was marital property.

¶ 21    Kathleen and John also stipulated that a Chase bank account and a Fidelity account were John's non-marital accounts under the prenup (because they were opened before the marriage), but the accounts were subject to reimbursement to the marital estate "for marital funds contributed to said accounts" and the stipulation specifically included the following: "Fidelity [account number] with a current balance of $1,237,757.59, subject to Kathleen's claim for reimbursement of $250,000 of marital funds that were transferred to the account."

¶ 22    The parties agreed that Kathleen would not deposit her paycheck into "the parties' joint account." John received bonus income from his employment in February 2017 for work completed in 2016. The bonus plus his salary were deposited into a checking account held in John's name only. One week later, John transferred $250,000 from that account to his Fidelity account. John also deposited a $6,914 refund check made out to both parties, issued at the closing on the purchase of the marital home, into one of his solely owned savings accounts at Chase. Kathleen and John further stipulated that under the prenup, all wedding presents belonged

to Kathleen, and that $2,750 received as wedding gifts was deposited into a joint checking account.

¶ 23                                   *Issues at Trial*

¶ 24        The trial court heard evidence on three issues: (i) Kathleen claimed the parties agreed, "regardless" of the prenup, that Kathleen would not deposit her money into a joint account, but that any income was marital; (ii) John claimed $12,000 of a $15,706 income tax refund from 2016 belonged to him and anything above that amount should be divided equally while Kathleen asserted the entire tax refund should be equally divided; (iii) Kathleen argued that notwithstanding the prenup, a portion of the down payment and closing costs came from marital money so John should not be reimbursed.

¶ 25                                   *Testimony*

¶ 26        Only Kathleen and John testified.

¶ 27        Kathleen testified that when they married, she and John bought a home together with John making the entire down payment. Their agreement provided closing costs were reimbursable to John. Kathleen opened as a joint savings account with her sister of which John was unaware. Kathleen also had a separate checking account into which she deposited her paychecks. She offered to deposit her paychecks directly to one of the accounts with John but John "said no." She contributed a total of $13,200 to one of the joint accounts from her monthly paycheck.

¶ 28        Kathleen moved out of the marital home in late November 2016. Under the prenup, all wedding gifts were hers so she took what she considered to belong to her. In March 2017, Kathleen began to correspond with John about their income tax filing for 2016. She had intended to file her 2016 tax return separately, but eventually asked their accountant for a comparison of

the tax liability of a joint filing. The accountant said she would owe taxes by filing separately, so she agreed to file jointly and split the refund.

¶ 29      John testified that filing jointly for 2016 would save money because of the tax rates. Had he filed separately, his refund would have been $12,000, and Kathleen would have owed $4,000 on her taxes. By filing jointly, they were in a lower tax bracket. Before he knew whether there would be a refund with a joint return, he agreed with Kathleen to split the tax refund equally. The actual refund was $15,708, which he later learned was because he made a $57,000 charitable contribution from his non-marital bank account. Without the charitable contribution, he would have owed $7,000 in taxes.

¶ 30      Emails exchanged between John and Kathleen indicate they intended to split any income tax refund for 2016 resulting from the more favorable tax bracket. In one email, John suggested they split the cost of the tax return preparer because they were already going to split whatever refund they received.

¶ 31      According to John, a certain checking account and a certain savings account were "preexisting" accounts in his name before the marriage, but became joint accounts afterward. The bank closed their jointly held Chase checking because Kathleen withdrew all the funds, leaving a zero balance. Two other accounts were joint accounts and were both closed after Kathleen depleted the funds. In 2015, John received a $200,000 incentive bonus that he deposited into his checking account, and then paid the mortgage company with a cashier's check "or something."

¶ 32      John made a series of deposits into an account solely in his name (he characterized this account as his "premarital savings account"). John never added Kathleen's name. He testified to

other transactions regarding various accounts and transfers. John received $201,630 in stock on February 16, 2017; and $94,909 in stock awards which vested on March 3.

¶ 33                    *Judgment for Dissolution of Marriage*

¶ 34        Regarding the bank accounts, the trial court in its judgment for dissolution stated, "All of the joint accounts are marital property" and not subject to claims for reimbursement from either party. In addition, "any accounts that a party had prior to the marriage that became joint accounts are considered marital property" with equal ownership. The trial court referred to the prenup and the provision that "there shall not be reimbursement of non-marital funds contributed to marital property unless the parties otherwise expressly agree, in writing." The trial court ordered John to pay Kathleen $49,124.14 to equalize the marital funds accounts. John appealed.

¶ 35                        *Motion for Reconsideration*

¶ 36        John moved to reconsider the judgment, arguing (i) the trial court erred by ordering John to reimburse allowing Kathleen to "back-door" her "dissipation" claim, giving John no notice of this argument; (ii) the trial court engaged in tax calculations not supported by the record and could not know how the 2016 income taxes were calculated; (iii) the trial court erred in setting the pertinent date for determination of marital property under the prenup; and (iv) the ruling that monies deposited into non-marital accounts were marital property was in error. The trial court denied the motion, and John appealed that motion too. On John's motion, this court consolidated the two appeals.

¶ 37                            Analysis

¶ 38                            *Forfeiture*

¶ 39        We first deal with a preliminary question raised by Kathleen. She asserts that John should have appealed from the November 22, 2017 order in which the trial court adjudicated the

relevant date for determining marital and non-marital property, and his failure to do so acts as a forfeiture.

¶ 40     As we know, John requested the Rule 304(a) language, making that order "final and appealable," and did not appeal. So the trial court proceeded to decide the unresolved issues regarding marital and non-marital property. After hearing evidence, the trial court entered an 18-page written judgment of dissolution.

¶ 41     Kathleen argues John's failure to file an appeal within 30 days of the ruling on the motion for a declaratory judgment forfeits the issue of the determinative date. John responds that the declaratory judgment order set forth only one aspect of the final judgment. We must decide whether the declaratory judgment order constitutes a final judgment as to one or more claims.

¶ 42     As the court explained in *In Interest of Johnson,* 134 Ill. App. 3d 365, 368 (1985), "if a Rule 304(a) finding is made as to an order which is in fact final, the affected party loses the right to appeal by waiting until termination of the remainder of the case." *Id.* See *Knox v. Keene Corp.*, 210 Ill. App. 3d 141, 145 (1991) (appellate court has no jurisdiction where party did not file notice of appeal within 30 days of Rule 304(a) finding). See also *In re Marriage of Best*, 228 Ill. 2d 107 (2008) ("Construing the agreement will indeed terminate a significant part of the parties' controversy.").

¶ 43     We hold that the declaratory judgment order resolved the question of the operative date for purposes of the prenup, and John forfeited that issue by not appealing the November 2017 order. Neither during the evidentiary hearing nor in the court's ruling after the evidentiary hearing does there appear a dispute on the issue of the operative date. And the reason is plain— the issue had been determined by the trial court in its November 22, 2017 ruling on the motion for declaratory judgment: "Respondent's Motion for Declaratory Judgment is granted and the

court declares that the relevant date for determination of marital/non-marital property is March 9, 2017 if the filing results in a dissolution of marriage." Then, after the evidentiary hearing, the trial court entered the Judgment for Dissolution of Marriage, in which as background facts the trial court states: "On November 22, 2017, this Court granted Kathleen's Motion for Declaratory Judgment and found that Agreement was valid and enforceable and that the relevant dates for determination of marital property pursuant to the Agreement were May 2, 2015 through March 9, 2017, the date that John filed the instant proceedings."

¶ 44    Furthermore, the order dissolving the marriage did not include any findings on the issue. In other words, the declaratory judgment was final. See *Best*, 228 Ill. 2d 107 (declaratory judgment order determining the validity of parties' premarital agreement and construing attorney's fees section met the statutory requirement of terminating some part of the parties' controversy. See 735 ILCS 5/2-701 (West 2004); 750 ILCS 10/4 (West 2004).

¶ 45    John raised the issue of the determinative date in his motion for reconsideration to which Kathleen responded that John's claim should be stricken because the November 22 order resolved the issue, and the trial court added Rule 304(a) language. By denying all the issues John raised in the motion for reconsideration, the trial court implicitly agreed that John forfeited this claim.

¶ 46                            *Bank Accounts as Marital Property*

¶ 47    Now we will address the trial rulings.

¶ 48    John asserts a term becomes ambiguous if the language is "reasonably susceptible to more than one construction." See *Omnitrus Merging Corp.*, 256 Ill. App. 3d at 34. Whether a contract is clear or ambiguous presents a question of law; the meaning of an ambiguity presents a question of fact. *Omnitrus Merging Corp. v. Illinois Tool Works, Inc.*, 256 Ill. App. 3d 31, 34

(1993). "Moreover, '[o]nce the trial court has interpreted the contract as a matter of law, the reviewing court may likewise independently construe the contract.' " *Id.* (citing *Tishman Midwest Management Corp. v Wayne Jarvis, Ltd.*, 146 Ill. App. 3d 684, 689 (1986).

¶ 49         Paragraph 3 entitled "Non-marital Property and Transmutation" provided "the following items shall be deemed Non-Marital Property, whether acquired by the applicable party before or during marriage," unless a written and signed memorandum demonstrated an intent to gift his or her property and "transmute it to marital property." Paragraph 3(E) included as non-marital property "[a]ll earnings, income, and other benefits derived from property designated as such party's schedule of property interests attached to this Agreement." (Schedule A listed John's non-marital assets and liabilities while Schedule B listed Kathleen's.) Notably, John's list included the entry "Savings & checking account balance - $40,000" without any account numbers. Given that John owned multiple savings and checking accounts in his own name when the prenup was signed, this entry is meaningless.

¶ 50         Paragraph 3(G) included as non-marital property which was owned with "one or more other persons, none of whom is the other party." Paragraph 3(J) designated as non-marital property "[i]ncome, including but not limited to salary, severance salary, dividends, distributions, deferred income, options (vested and non-vested), grants (vested and non-vested) and retirement benefits received by either party from any source resulting from that party's personal efforts or otherwise during the marriage, *unless added to a joint account as described in paragraph 5 of this Agreement."* (Emphasis in original.).

¶ 51         John argues the trial court's determination that three of John's separate accounts were marital property contradicted the prenup's clear and unambiguous language. Beyond boilerplate contract law, John offers no support for his arguments. He attempts to relitigate the facts without

proper citations to the record (non-existent record references, as Kathleen notes in her brief), and asks this court to rule differently.

¶ 52    Because the record does not include a transcript of the hearing on John's motion to reconsider, the rule in *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984), applies. Under *Foutch*, where the record is incomplete, we presume that the order entered by the trial court was "in conformity with law and had a sufficient factual basis" and must resolve against the appellant "[a]ny doubts which may arise from the incompleteness of the record." *Id.* at 392. This is because the "appellant has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error" (*Id*. at 391-92)—a rule that is equally applicable to a decision made after an evidentiary hearing.

¶ 53    John's position at trial was that the bank accounts he held in his name before he was married should remain nonmarital property even after he added Kathleen's name as agreed in the prenup. He argued in his Motion to Reconsider "The characterization of the monies is decided on by action of the party who deposits the money. The parties contemplated being able to designate their income as marital or non-marital, as evidenced by the two separate paragraphs in their prenuptial agreement." The record does not support his conclusion.

¶ 54    Regarding deposits into separate bank accounts not jointly held with Kathleen, John now argues that the prenup unambiguously states that money deposited in a joint account is marital; it is non-marital if not deposited in a joint account. In other words, as John states in his opening brief, "Whether income made during the marriage was marital or non-marital depended on the action of the parties."

¶ 55    Kathleen maintains the prenup was ambiguous regarding the characterization of property. Paragraph 3(J) indicates income is non-marital unless added to a joint account, but paragraph

5(E)(3) directs both parties to contribute "salaries and bonuses which are earned and actually paid from the employer during the marriage" to the bank accounts or investment accounts described—"Joint Household and Future Joint or Marital Property." Reading this direction in concert with paragraph 3(J) which describes income received as non-marital property "*unless added to a joint account as described in paragraph 5 of this Agreement*" (emphasis in original), we conclude that the agreement intended that, with the exception of stock not vested during the marriage, earnings, etc., would be deposited into joint accounts that the parties intended to open. Instead of opening new joint accounts, John added Kathleen's name to established accounts. Despite his position that one of the accounts should be considered his sole account because it existed before the marriage, the record reveals the parties stipulated that the account be considered a joint account.

¶ 56        Regarding an account John opened in his name during the marriage, he takes the position that this was his own account and his earnings deposited there should not be marital property subject to division. The prenup has no provision supporting his argument. Paragraph 5(E)(1) states, "Separate accounts held at the date of the marriage shall remain separate property." But, the prenup then states the intention to establish joint accounts which would be marital property, and if the marriage is dissolved, "shall be deemed owned 1/2 by each party." As noted, the prenup further provides salaries and bonuses earned and paid during the marriage "are to be contributed to the bank accounts or investment accounts described in this subparagraph E." An account not held at the date of the marriage does not fit the definition for non-marital property, and John's argument regarding the account he opened in October 2016 fails.

¶ 57        As to John's argument that Kathleen's contribution to the marriage was small, one of the stipulations was that the parties agreed that she would not deposit her paycheck into a joint

account. Although the evidence showed Kathleen did contribute monies, there is no denying that John earned around ten times more, so inevitably he paid more toward the marital expenses. This is simply a fact, and John's attempt to recoup some of these expenses fails.

¶ 58                                    *Reimbursement of Marital Estate*

¶ 59        John next argues that the trial court erred by classifying certain non-marital funds as marital and finding the marital estate was entitled to reimbursement. The trial court found the evidence established that John used marital funds to pay for expenses on his non-marital real estate which he sold during the marriage. John admitted he used marital funds for those expenses and did not provide any evidence that Kathleen agreed to the payments as required by the prenup. For this reason, the trial court properly ordered John to reimburse the marital estate.

¶ 60        Section 8 addresses the possibility of divorce and provides that in that event a party's non-marital property would remain separate. Section 8 F., however, provides a party "may seek reimbursement for any marital funds or assets that were used by the [other] party in purchasing, improving, maintaining or otherwise contributing to the value of the party's Non-Marital Property without the express written consent of the other party."

¶ 61        We find no support in the record for John's assertions. Despite record references in his brief, the objections Kathleen made in her "Affirmative Defense II" are well-taken. We are unable to locate the pages in the record as cited. This court should not be burdened to hunt for record support. See *In re Marriage of Auriemma*, 271 Ill. App. 3d 68, 72 (1995). Although we do not strike John's brief, we may affirm on any basis in the record. *Beacham v. Walker*, 231 Ill. 2d 51, 61 (2008). See *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 97 (1995) ("As a reviewing court, we can sustain the decision of a lower court on any grounds which are called for

by the record, regardless of whether the lower court relied on those grounds and regardless of whether the lower court's reasoning was correct"). Accordingly, no error is evident in the record.

¶ 62    John next asserts Kathleen's claim to the monies for John's $21,535 car purchase for his son and $2,055 transferred into an account he held jointly with his son was really a claim for dissipation. Without specifically arguing the facts or any law, John claims error. John also places blame on Kathleen for allegedly not complaining about the car purchase earlier. John's attempt to recast the claim for reimbursement as a dissipation claim is flawed and unavailing.

¶ 63    "Dissipation" refers to the use of marital property for the sole benefit of one of the spouses for a purpose unrelated to the marriage at a time that the marriage is undergoing an irreconcilable breakdown. *In re Marriage of O'Neill*, 138 Ill. 2d 487, 497 (1990). John's brief admits as much, "Nor were the parties undergoing any breakdown in their relationship as far as John knew." There is no merit to John's position.

¶ 64    Next, John asserts the trial court erred by designating $87,836.43 he used to pay taxes on his non-marital income as marital funds. John argues three points against this finding. John and Kathleen were married on May 2, 2015, and the parties filed a joint tax return for 2015. First, John's claims Kathleen waived any objection to the 2015 tax, arguing that Kathleen consented to the use of the marital monies when she signed the joint return. John provides no authority other than his bare assertion. We fail to see where signing a joint tax return when one is married would somehow give blanket consent to the source of payment for taxes owed.

¶ 65    John also claims some of the funds used were non-marital funds from the sale of John's condo. John asks this court to do arithmetic using deposit and withdrawal amounts and then conclude ("it is easy to see") that a lump sum payment to the IRS used "very little" marital

funds. Despite John's claim that "the evidence was clear," the evidence was not presented to the trial court.

¶ 66      Next John claims the trial court incorrectly calculated taxes due on John's non-marital income. John asserts, "The circuit court cannot know how the taxes were calculated and how the payment of $73,836.43 would be applied as no expert accountants testified." On appeal is too late for John complain about the lack of proof. This court does not hear new evidence. See *In re Marriage of Micheli*, 2014 IL App (2d) 121245, ¶ 21 (declining to consider evidence that was not presented to trial court and stating "introduction of new evidence on appeal is improper").

¶ 67      Finally, the trial court found that in the first two months of 2017, John over-withheld taxes from his paychecks. John argues that the trial court did not have enough evidence to support this finding ("jump to such a conclusion"). Again, John's complaint about a lack of proof is disingenuous.

¶ 68                              *2016 Income Tax Refund*

¶ 69      Finally, John claims the trial court's award of one-half of the 2016 income tax refund as error.

¶ 70      Kathleen responds that John prepaid $30,000 on for 2016 income taxes from marital funds, resulting in a refund of $15,706. The parties, though, stipulated at trial "[o]n July 2, 2016, John prepaid taxes for 2016 in the amount of $30,000 from the joint checking account []." The parties further included that account in the list of joint bank accounts in the stipulations. John's testimony that the account was in his name before trial and therefore his deposits to the joint account should be his sole property lacks candor.

¶ 71      As the trial court found, the record shows the parties agreed to file a joint tax return and equally divide the refund. Kathleen's trial testimony and emails admitted into evidence indicate

the agreement came about when the accountants calculated taxes owed if the parties filed jointly and if they filed separately. As it was advantageous to file jointly, Kathleen agreed despite her original intention to file separately.

¶ 72    John testified that he learned the refund arose due to his charitable contributions from his non-marital funds, and, at that point, did not agree to an equal split. This shift in position does not negate the agreement. Moreover, federal income tax refunds based on income during the marriage consitutes marital property regardless of receipt before or after dissolution. *In re Marriage of Orminston*, 168 Ill. App. 3d 1016, 1018-19 (1988). The parties were free to agree otherwise. See *id*. ("The respective interests of the parties in the refund could have been divided according to the agreement of the parties, or can be determined by the court in the absence of agreement of the parties.")

¶ 73    Affirmed.